CARROLL vs. THE EAST TENNESSEE, VIRGINIA AND GEORGIA RAILWAY COMPANY, and vice versa.

1. A motion for a new trial duly continued from a day set for hearing it in vacation, to the next term of the court, need not be further continued from one day to another during the term, though successive orders be passed appointing particular days for the hearing. Once in court in term time, the motion remains there in full life until heard or otherwise disposed of.

2. Where the want of care and diligence imputed to the plaintiff, who was a fireman upon a locomotive, relates to his failure to keep the engineer awake or take other measures for his own safety, and the imputed negligence reaches back some hours, a paragraph of the court's charge to the jury which might be understood by them as restricting the inquiry to a much shorter period, is erroneous. And for the court in the same paragraph to specify certain conduct of the fireman, and instruct upon it in a way to imply that the same would not be negligence, is additional error, the question whether such conduct would or would not be negligence being for the jury.

3. The measure of risk which a fireman ought to incur by remaining upon a locomotive and assisting a sleepy engineer to run the train, is that only which his duty and obligations to the company, under all the circumstances, impose upon him. If he subjects himself to any greater risk and is thereby injured, he is not without fault and cannot recover.

4. Reports to the general manager of the company touching the facts, circumstances and results of a railway accident, and who was to blame therefor, made several days after the event, by the superintendent and the conductor, supported by the affidavit of the latter and of several other employés, are not admissible in evidence to affect the company, whether such reports were exacted and made under standing rules requiring the same, or under special orders for the particular occasion, no question of notice to the company being involved in the controversy.

5. It being in question whether a fireman could, by reporting the facts of his situation to an official of the company by telegraph, have obtained relief from his peril, evidence is admissible to show that under the usage and practice of the company in like or analogous circumstances, relief would probably have followed in a specified way and by the use of specified means.

6. An employé of a corporation, though obligated in writing as terms of his employment, to "study the rules governing employés, carefully keep posted and obey orders," is not bound by rules (as

such) of which he is ignorant, and which have never been promulgated to him by the company.

September 23, 1889.

New trial. Practice. Railroads. Negligence. Charge of court. Master and servant. Evidence. Notice. Before Judge GUSTIN. Bibb superior court. May term, 1888.

John M. Carroll sued the railroad company for injuries which he sustained in a collision on that road, he being the fireman on one of the colliding engines. The following was, in substance, the testimony for the plaintiff: He was in his twenty-fourth year at the time of the trial, which occurred about a year after he was injured. Was fireman on defendant's engine; had made only three or four trips; was a new and green hand. The train went some distance down the road, and the engine and caboose were turned back to take up cars along the road. The collision occurred about 3:30 in the morning, at a station known as Dubois, between plaintiff's train and another, the latter being on the main track (as it seems it should have been), and being run into by the former. The night was dark and foggy; and plaintiff's testimony tended strongly to prove that the engineer of the plaintiff's train was asleep at the time; that his train was running at about twenty miles an hour; that his train should have taken the side-track, instead of the main track, as it did; that plaintiff was engaged in firing the engine just before the collision, and the glare was in his eyes so that he could not see ahead before the collision; that he called to the engineer several times, but failed to arouse him, and just then the collision occurred; that the engineer had been asleep several times before, and plaintiff knew it, as did the conductor also, for when the engine was—

on the turn-table, preparatory to being started on the
return trip, the engineer had to be awakened (possibly
by the conductor) in order to move the engine off the
table, and the conductor made a remark at the time
about the engineer's being asleep. Dubois was a station
a short distance from Eastman and between that town
and Macon. Eastman was the telegraphic station; and
it seems that there both the conductor and engineer
received telegraphic orders, both of them having gone
into the telegraph office; but these orders were not
communicated to plaintiff, and were not observed by
the engineer certainly, and probably not by the con-
ductor. They indicated that another train was to be
met and passed at Dubois. No bell-cord was attached
to the engine; the company did not use them on its
freight-trains. The plaintiff was terribly injured. One of
his legs had to be amputated about one and a half inches
below the knee. He was confined to his bed about two
months, suffering greatly. A fireman's pay was about
$1.75 to $2 per day. Defendant knew that this was
plaintiff's first experience in railroading. Since the in-
jury he has not been able to work, except at a very light
job which he could sit down to attend, and for which
he received about $5 per week. He is not educated, and
cannot make a living at pursuits requiring education.
Williamson was the conductor of the train; Williams
the engineer; and Lewis Mims the train-hand. This
was the first time that plaintiff had run with Williams.
Defendant did not furnish plaintiff with any rules, but
he procured a piece of a rule-book from his brother-in-
law. He knew how to stop or reverse an engine, but
would have been slow in doing it. It was the engi-
neer's business to control the engine; and plaintiff
would not have had time, after he saw the other train,
to stop the engine, even if he had understood how to

do it.  The day after he was hurt, he was called on by
officials of defendant for a statement as to the accident,
which he made, but he was in great suffering at the
time, and remembers but little of that statement.  Is
not sure that the engineer was asleep at the time of the
collision, but he seemed to be so; plaintiff called to him
several times without a response.  It was in evidence
that the conductor did not inform the train-hands that
they were to pass the train at Dubois; that one of the
hands told the conductor before the collision that the
engineer had been asleep on the engine that night; and
that plaintiff waked him one time.  When the collision
came, plaintiff, the engineer and the crew of the train
had been out about fifteen hours, but the engineer had
had a long rest before he started on this trip.  It was
further shown that it was extremely dangerous, for
many evident reasons, for the engineer to be asleep on
his running engine; also that it depended largely on
the fireman as to whether it was safe for the engineer
to lie down on his engine.  Plaintiff's expectancy of
life was shown to be a little over thirty-nine years.
Plaintiff also introduced reports as to this accident,
made by the superintendent of defendant to its general
manager, accompanied by the statement of Williamson,
Carroll, Mims, Durdin and other trainmen as to the
cause of the accident and the nature of plaintiff's injury.
Enclosing these statements, the superintendent reported
the damage done to the engines and cars, and further
stated that the train on which plaintiff was, received
orders at Eastman to meet the other train at Dubois;
that the other train had just stopped at Dubois, when
the first mentioned train was heard coming under a full
head of steam, but no effort was made on the part of
engineer Williams to stop there, and all statements go
to show that he was asleep up to the time the trains

collided; that plaintiff said he waked Williams several times that night; that the crew had about thirty-six hours rest before leaving Macon, and they had been out about fifteen hours; that the plaintiff was found with his left leg mashed, so that amputation was necessary; and that the entire responsibility rested with the crew of the train of which Williams was engineer, and they had been released from service. The statements referred to as having been made by Williams, plaintiff and others, so far as material, were to the effect that plaintiff lost his leg; that the cause of the injury was the engineer's being asleep; and that the train was running at about twelve miles per hour. It was shown by other testimony for plaintiff that both Williams and Williamson were discharged after the collision. There was testimony for the plaintiff to the effect that he did not see Williams asleep until they started back on the return trip; that he waked him every time he saw him asleep except the last time, and then did not have time to do it; that if he told witnesses for defendant that the reason he did not wake Williams was because he feared to offend him, he did not remember it; that he did not apply for the rules of the road because he did not know where to apply, although he knew there were rules, but he had no chance to study them and made no promise to do so; and that he did not apply to the engineers for their rules or ask to be allowed to see them. Another witness swore that he was present, he thought, all the time during the conversation in which, as some of defendant's witnesses testified, plaintiff said he did not wake Williams for fear of offending him, and did not hear plaintiff say any such thing. Both sides put in evidence certain rules of defendant.

The evidence for the defendant was, briefly, as follows: Williams had been in its employment as an en-

Carroll *vs.* The East Tennessee, Virginia and Georgia Railway Co., and *vice versa.*

gineer for about a year before the accident. His repu-
tation was that of a careful man ; he was so prudent
that it was noticeable, and he was slow and cautious.
Before he was employed, inquiry as to his fitness was
made, and his conduct was unusually good afterwards.
He was in no accident before this one ; and there had
been no occasion to reprimand him. An engineer
should be awake and continually on the lookout while
running his train. If the engineer got drunk or ill, it
would be the fireman's duty to report it, and for this
purpose he could have the assistance of the telegraph
agents along the line of the road. If the engineer
should become disabled, the fireman could stop the
train in several ways, and had the whistle for commu-
nicating with the conductor. Shortly after the acci-
dent, the plaintiff stated that the engineer had been
asleep two or three times that night, and that he did
not awake him the last time for fear of offending him.
It was the duty of conductors and engineers, certainly
by way of extra precaution, to communicate their or-
ders to their subordinates. The trains on this road
were run by telegraph. It was the engineer's duty to
specially look out when the fireman was busy. The
conductor was the superior officer when the train was
out, and the engineer was the superior officer of the en-
gine. Williams and the conductor both were dismissed.
By a rule of the company, its employés must provide
themselves with and read its rules; it is their duty to
apply for such rules, and if they did so, they would be
furnished with a copy. The fireman got his instruc-
tions from the engineer and from the rules. If nobody
but the engineer and fireman were on the engine, and
the engineer were asleep, the fireman would be the only
one who would furnish information. There was evi-
dence that another person, a negro, was on the engine

at the time of the collision, but that he was not employed but simply working his way. If the engineer became disabled from any cause, the fireman would have nothing to do but report the fact to the telegraph operator, and the train-dispatcher would have authority to put the train on a side-track and send another man; there is no written rule for such circumstances. If the engineer became disabled, the conductor could put the train on a side-track. There is no rule requiring the fireman to remain on the train after the engineer becomes unable to run it, except, in cases of doubt, to take the safe side. If the engineer became disabled, the fireman, after reporting the fact to the conductor, would have a perfect right to protect himself by leaving the train. If the fireman found the engineer asleep, it was his duty to report it to the master of trains. Between the fireman and the conductor, in case of disability of the engineer, the latter is the superior power. The defendant put in evidence statements made by plaintiff in his application for employment, in which it is stated that plaintiff had had no experience in railroad service, never having been employed by a railroad, that he gave no references, and that he would study the rules governing employés of the road, carefully keep posted and obey them.

The jury found for the plaintiff $12,000. The defendant moved for a new trial on the following grounds:

(1) The court erred in refusing to continue the case on account of the absence of D. Williamson, the conductor of the train, the following showing, in substance, having been made: Nolan, who represented defendant as law agent and was specially appointed to prepare each case for trial and to procure the attendance of witnesses, ascertained that Williamson would be an important witness and could testify as to what

plaintiff had said and done. From the time the case was brought until it was set for trial, he made continual and frequent inquiry, and learned that Williamson lived in Bibb county and could be subpœnaed at any time. The court was in session several months at a time, and it was the practice of the bar to *subpœna* witnesses for the day on which a case was set for trial, and no witness was required to attend during the whole term. When this case was set for trial, Nolan was sick, and so were all the members of his family. Nevertheless he attempted to prepare this case, and was then informed that Williamson was in Macon; but before the trial, he ascertained that there were two Williamsons, both conductors of defendant and both living in Macon; and thus he had been misled, for D. Williamson had recently removed from Macon while the other person of that name remained. He immediately made every effort, by telegraph, writing and inquiries, to find where D. Williamson was; and so did the other counsel for defendant; but they failed to do so. This motion was not made for delay, but defendant expected to have Williamson present at the next term or at such time as the case might be postponed to. This motion was made when the case was called, and renewed after plaintiff had closed and had testified that Williamson knew the engineer had been asleep and had called him to wake him; defendant claiming that it could controvert this testimony by Williamson if he were present. The motion was overruled both times.

(2) The court erred in refusing a nonsuit.

(3–5) The verdict is contrary to law and evidence.

By amendment, the first ground was amplified, and the following grounds were added:

(2) The court erred in admitting in evidence the report of defendant's superintendent to its general

manager, purporting to be a statement of facts touching the collision gathered by the superintendent from inquiries made; the objection being that it was not legal evidence, as it purported to set forth no admission within the knowledge of the superintendent, and was not under oath.

(3) The court erred in allowing plaintiff to introduce in evidence the report of the accident made by Williamson, Mims, plaintiff and others, containing the opinion of these persons as to who was to blame for the accident; counsel for plaintiff stating that they did not offer it as a statement of his; and the court not calling the attention of the jury to the fact that they could not consider as evidence that part of the statement made by plaintiff.—The objection was, that it was illegal and irrelevant, and its statements (especially the opinions as to who was negligent) were not competent as admissions against the company.

(4) The court erred in refusing to allow the master-mechanic of defendant (having charge of the motive power and the appointment of engineers and firemen) to answer the question: "In case of danger of that kind, where the engineer should be suddenly taken ill, or where he should go to sleep and continue to go to sleep, under the rules of the company what would be the duty of the fireman?" The court stated that he would allow proof of the surrounding circumstances and appliances which plaintiff had at his command to prevent the injury, but not of what his duty might have been, as that was an inference to be drawn by the jury.

(5) The court erred in refusing to allow Boldridge (who had testified that he had charge of the engineers and firemen at Macon and furnished them the rules of the company when they asked for them) to answer whether there had been any instance in which the rules

had not been furnished to any engineer or fireman who applied for them.

(6) The court erred in refusing to allow Gallagher (who had testified· that he was defendant's master of trains and had control of the train-dispatcher, and that all trains were moved by telegraph under his direction through the dispatcher) to answer this question : "Under the universal practice in the operation of this road, what is the recognized rule by train-dispatchers as to what they should do, and as to what they would do, in case they have information that an ingineer in charge of a train—pulling a train out on the main line—has become incapacitated for the safe running of an engine and train, either by reason of sudden illness or drunkenness or continued falling asleep ?".

(7) The court refused to allow the same witness to answer this question : "In case the engineer had become incapacitated for the safe running of the train, either by sudden illness or drunkenness or continued sleeping, if the fireman should report that fact to the conductor, and he should fail to stop, what would be the right of the fireman as to whether or not he would continue to ride on that engine, or as to whether he should refuse to go further with it ?"

(8) The court erred in asking Boldridge this question : "Under the state of facts that have been stated, that is to say, if the engineer should for any reason get in a state where he didn't or couldn't or wouldn't take proper control of his train, or from sleep or drunkenness or sickness, or any such cause, and the conductor and fireman both knew it, who would have had the greater authority to take charge of the train ?" The witness answered : "The conductor; it would be subject to his orders."—The objection was, that this tended to mislead the jury and to induce them to draw im-

proper conclusions; the issue before the court then being as to what the fireman ought to do if the conductor should fail to act, where the engineer had become incapacitated.

(9) The court erred in charging thus: "The rule as to the burden of proof is as follows: after proving the fact and the degree of the injury, if the plaintiff will show himself not to blame, the law then presumes, until the contrary appears, that the company was to blame; or if he will show on the other hand that the company was to blame, the law then presumes, until the contrary appears, that he was not to blame. So that, in order to make a *prima facie* case, (that is to say, on which the jury is authorized to render a verdict,) unless something is shown on the other side to keep them from rendering a verdict and change the *onus*, (that is, the burden of proof,) he need not go further than to show by evidence one or the other of these propositions: either that he was not to blame, or that the company was. The company, taking at this stage the burden of reply, can defend successfully by disproving either proposition. The disproval of both is not necessary, but until one or the other shall be overcome, the defence is not complete."—Defendant submits that, where an employé shared directly in the act which resulted in his injury, before he can recover he must show that he was free from fault; and there is no presumption in his favor until this is shown.

(10) The court erred in charging thus: "If the company had rules, it was his duty as an employé to obey those rules; but it was primarily the duty of the company, in the opinion of the court, to furnish him those rules and to call his attention to them. If he was a new employé just coming on the road, it was their duty

either to furnish him directly with the rules through some one of the superior officers, or else put him especially upon notice as to where he could obtain those rules; and if he did not get those rules, then, if those facts do not exist, it was not his fault, except that if he got knowledge of the rules, if he saw the rules in the possession of other employés and had information that it was his duty to study them, or made any agreement that he was to study them, and if they were in the possession of a person he could have obtained them from, then it was the duty of the employé to study them, and it would be negligence on his part not to have done so. But on the other hand, if he was put upon no particular notice that it was his duty to get and study the rules, and nobody of the road, no officer of the road and no superior officer or employé, ever said anything to him about them, or anything of that kind, then that wouldn't put the duty on him of studying the rules." —It was the duty of the court to construe the agreement and to tell the jury what it meant, and not to have left it an open question.

(11) The court erred in charging thus: "Inquire how long he may have been in the employment of this railroad company; what pains they may have taken to instruct him in their rules; what pains, in your opinion, they ought to have taken to instruct him in the exercise of ordinary care on their part; and all other like facts and circumstances of that kind."

(12) The court erred in charging thus: "Now with reference to his finding another employé of the company in a condition where he was not properly competent to perform his duties, you may inquire how long he had been that way, in that condition; to what extent he was in that condition; whether it was such as to render him entirely incompetent to perform them, or whether it

rendered him only occasionally incompetent. Inquire also whether he exhibited this incompetency under circumstances where it made it dangerous for him to continue the control of his train, or whether he only exhibited it in cases of slight importance, or where the other employé might recall him and put him upon notice at any time. You may also consider whether the plaintiff in this case had notice of any orders to stop at any particular place, and you may consider whether the other employé, to whom this negligence may be attributed, had any such notice, and whether or not if the co-employés, if the engineer had such notice, whether he would or would not have exercised greater diligence to keep himself awake so that he would be able to perform his duties. You may take into consideration these and other like circumstances."

(13) The court erred in charging as follows: "In reaching a conclusion as to the alleged negligence of the plaintiff, you must consider all the facts and circumstances which are in evidence before you. Look to the crew of the train; see who composed that crew. Was there a conductor on that train? what were his powers? Was there an engineer, and what were his powers? See if the engineer went to sleep; see if that sleep was so deep and protracted as to render him unable to perform his duties; or was it only momentary in its duration? See if he went to sleep, and how often. See if he went to sleep at any time before the injury, while his engine was running; if so, under what circumstances. See whether those circumstances were such as to put a reasonably prudent man on notice that, in riding on the engine with the engineer thereafter, he was exposing himself to dangers greater than those ordinarily being in the course of his business. See if the engineer went to sleep at a station while waiting for

another train; and see if that was such a thing as to
put a reasonably prudent man on notice that, in riding
on the engine with an engineer thereafter, he was ex-
posing himself to dangers greater than those ordinarily
being in the course of his business. In other words,
look carefully into all of the facts of the case in evi-
dence before you. See when the train last stopped be-
fore the injury; see if it stopped at a station; what was
done; what did the engineer do; see if he was asleep
then, or awake and in the discharge of his duties; see
how long it was after that before the collision. What
was the condition of the engineer after leaving Eastman
up to the time of the collision; was he asleep or awake?
If he was awake when the train left Eastman, and went
to sleep and was asleep at the time of the collision, or so
near thereto as to be unable to prevent it, see where he
was first known to be asleep by the plaintiff. What
did the plaintiff do between Eastman and Dubois; what
were his duties as fireman? See if it was his duty to
fire his engine; see if, when he commenced to fire his
engine, he saw and knew that the engineer was awake
and at his post in the discharge of his duty; see if he
discovered the engineer asleep when it was too late to
prevent the collision; see if, as a reasonably prudent
man, he did anything he ought not to have done, or left
undone anything that he ought to have done, which at
the time of the alleged injury contributed to it; and
then, after considering all the facts and circumstances
which are in evidence, determine whether the plaintiff
contributed in any material particular to his injury at
the time. If he did, he is not entitled to recover; if he
did not, he is entitled to recover, if free from fault in
other particulars. Now in considering the circum-
stances, I particularly charge you that you will not only
consider the circumstances which I have just called your

attention to, but all other circumstances of the case which are in evidence. I charge you, in connection with that, that you are authorized to consider the condition of the engineer at all times during that trip, entitled to take that into consideration. While the rule of law is, that the principal matter to which you shall give your consideration is at the time of the injury, yet you are authorized, and it is your duty, to take into consideration his condition at all times during that trip."

(14) The court erred in charging as set out in the second division of the opinion.

(15) The court erred in charging hus : " There is in evidence, and will go out with you for consideration, a series of statements made and signed by the plaintiff. In one of these statements, there are certain agreements on his part. Now in construing this agreement, I charge you that the law puts a reasonable construction on all agreements ; and the reasonable construction of this agreement is, that the plaintiff would study, etc. the rules so soon as they should be furnished to him by such officer of the defendant to whom this duty belongs ; and if there was no officer, and he had not furnished him with the rules, then the plaintiff was not bound by his agreement, unless he came in actual possession or his attention was called to them, if he had not been furnished with them, unless he had actual notice of what the rules contained. The burden of establishing knowledge on the part of the plaintiff of such rules, is upon the defendant."

(16) The court, after charging, at the request of defendant, that if defendant prescribed certain rules for its employés, and when plaintiff applied for a position, required him to promise to study them, etc., but he did not do so, and a want of knowledge of them contributed to the injury, and he incurred a greater risk than these

rules required him to run and was thereby injured, he could not recover,—erred in adding these words : " Provided the defendant had furnished him with a copy of these rules, or given him specific direction where he could get them."

(17) Set out in the third division of the opinion.

(18) At the request of the defendant, the court charged that if the plaintiff was injured by reason of the fact that the engineer was asleep at the time of the accident that caused the injury (and this fact was known to plaintiff), and if the jury believed that this was negligence on part of the engineer, yet if the plaintiff too was negligent, etc., he could not recover ; but added the words enclosed by parentheses above, and thereby erred.

(19) The defendant requested the court to charge that if the plaintiff promised to study the rules, but failed to do so, and had opportunity to inform himself as to them, then, so far as they had any bearing on the accident, he was charged with knowledge of them, " whether he knew them or not." The court erred in striking out the last clause quoted, and in adding these words: " If he had notice, it was his duty to procure a copy of them, but it was primarily the duty of the company to furnish him with them."

(20) The court charged, at the request of defendant, that if there were rules of the company to the effect that trains were to be run under direction of the conductor, except when such directions conflicted with the rules or involved risk, then the jury could consider whether plaintiff remained on the engine after he knew the engineer to have been asleep several times ; and if this was a risk greater than that incidental to the service, plaintiff was responsible for such injuries as resulted therefrom, although he remained on the engine with the sanction or direction of the conductor. But

he erred in adding thereto these words: "But it was primarily the duty of the conductor to give such orders as were necessary for the protection of the train and the employés thereon."

(21) The court was requested to charge that if there was a rule of the company that required every employé to exercise the utmost caution to avoid injury, this was a reasonable regulation, and if plaintiff failed to observe it, and if it was negligence not to do so, and if by reason of such failure he received his injuries, he could not recover. But he erred in adding thereto these words: "Provided he had notice of such rule. or reasonable opportunity to procure such notice."

(22) The court erred in adding the words enclosed by parentheses below to the following charge, which was requested: If there was a rule of the company to the effect that every employé should take sufficient time before exposing himself, and to refuse to obey any order which would expose him to danger, and if plaintiff remained on the train with knowledge of the engineer's having been asleep, etc., then the jury could consider what was the right and duty of plaintiff to protect himself from danger, and whether he took sufficient time before exposing himself; and if it was dangerous to remain on the train, and plaintiff failed to exercise any right he may have had (under the rules of the company, of which he had knowledge or reasonable opportunity of procuring knowledge,) to protect himself, or failed to do any duty to protect himself, or to take sufficient time before exposing himself, and if such failure was negligence, and he was afterwards injured by reason of the engineer's being asleep, he could not recover.

(23) The court erred in adding the words enclosed by parentheses below to the following charge, which was requested: If there was a rule that every employé

should, in cases of uncertainty, take the safe course and run no risk, (and this rule was known to plaintiff, or he had reasonable opportunity of obtaining such knowledge,) then the jury could consider whether the circumstances· presented a case of uncertainty as to what should be plaintiff's conduct, and if so, what was the safe course in such case ; and if plaintiff did not take the safe course, and his failure to do so was negligence, he could not recover.

(24) The verdict is so excessive as to justify the suspicion of mistake, bias or prejudice on the part of the jury.

The motion was sustained on the 14th and 17th amendment grounds, and the plaintiff excepted. The defendant took a cross-bill of exceptions to the refusal to sustain the other grounds of the motion. Another exception of the plaintiff was on the question of practice, reported in the first head of the opinion.

DESSAU & BARTLETT, for plaintiff.

BACON & RUTHERFORD, for defendant.

BLECKLEY, Chief Justice.

1. The case was tried at the November adjourned term, 1887, and the motion for a new trial was made during the same term, the hearing of the motion being fixed by order for a day in vacation and then continued to the following May term. Other continuances took place during the May term, each of them being to a particular day. One of these days was June 30th, on which no action was taken with reference to the motion. On July 2d the motion was taken up and continued to a subsequent day in the same month, and on the latter to a still later day, when it came up for a

hearing, and the respondent moved to dismiss it because no continuance from the 30th of June to the 2d of July had been granted or entered. The motion to dismiss was properly overruled, because after the May term of the court was reached by duly continuing the motion from the November adjourned term, no further continuance was requisite in order to keep the matter in court so long as the May term lasted. And that term, as we understand the record, was still in progress when the motion for a new trial was finally taken up and decided. The rule as to continuances from day to day in vacation has no application to what transpires in term time. Once in court, the motion remains there until heard or otherwise disposed of. Fixing a time for the hearing, or entering continuances from day to day, is no disposition of it.

2. The court committed no error in granting the motion for a new trial on the 14th and 17th grounds of the amended motion. The most vital question in the case was one of fact, to wit, whether the plaintiff was negligent in remaining upon the engine and exposing himself to risk, without taking more active and diligent measures to keep the engineer awake, or urging the conductor to do so, or telegraphing to the master of trains or some other officer to interpose. That the engineer was falling asleep at his post was known to the plaintiff, who was his fireman, some time before the collision happened, and consequently the question of his negligence should not been restricted in point of time to the moment of collision and some minutes previous thereto.

The charge of the court in the 14th ground of the motion was as follows: "If the jury should believe from the evidence in the case that the train on which the plaintiff was as fireman, was approaching another train

on the same track, that the engineer of plaintiff's train
was at some distance from the latter train, at his post
and awake discharging his duty, that the plaintiff did
not know of the approaching train, and that the plain-
tiff having finished firing his engine, took his seat on
the place assigned to him, and then discovering a train
ahead, and that his engine was not slacking and that
the engineer was asleep, then I charge you that if the
plaintiff was injured by a collision which he could not
have avoided by the exercise of all reasonable care and
ordinary diligence, in the causing of which no fault was
committed by or attributable to him, he may be entitled
to recover."

This might have been understood by the jury as virt-
ually throwing out of the case any and all negligence the
plaintiff may have been chargeable with until just before
the collision took place, and was, besides, an intima-
tion to the jury that the conduct of the plaintiff, if as
described in the charge, would not amount to negli-
gence. But for this instruction the jury might have
thought, in view of what had already transpired within
the plaintiff's knowledge showing the tendency of the
engineer to go to sleep, that it was not enough for the
plaintiff to see that he was awake and then seat him-
self at the place assigned to him, but that he ought to
have continued to see to it and assure himself that the
engineer kept awake. The charge seems obnoxious to
both the objections which we have indicated, viz. a too
narrow restriction in point of time, and a too wide lat-
itude in drawing to the court and taking from the jury
a decision of the question of negligence.

3. The request of counsel for the defendant to charge
the jury as set out in the 17th ground of the motion
for a new trial, was as follows: "If you find that
the said Carroll was an employé of the defendant, and

that he subjected himself to any greater danger or risk than his duty and obligations to said company required, and that by reason of said increased danger or risk he has been injured, then the court charges you that he cannot recover." In view of the testimony in the record, we agree with the court in thinking that this charge should have been given in the terms requested, and without any qualification. If the plaintiff took any improper risk, it was by remaining upon the engine without doing more than he did in seeing that the engineer kept awake, or without appealing to the conductor or reporting by telegraph as it was contended he should have done. If he was in fault in either of these respects, he was negligent; and if negligent, he could not recover. The court, in giving the request in charge to the jury, qualified it by adding after the word "required," the phrase, "by any rules, which rules had been communicated to him." This qualification narrowed the charge to a violation of the rules, whereas the plaintiff's duty to protect himself against his sleepy engineer might be as complete and obligatory without rules on the subject as with them. The jury might have thought that if he had common sense, he ought not, under the circumstances, to have remained passively upon the engine with knowledge that the engineer was going to sleep at intervals, whilst in charge of his engine. Due care in keeping the engineer awake, or if that could not be done, by ceasing to aid in running the train, involved not only the safety of the fireman but that of others, and also the preservation of the company's property from wreck and destruction.

4. We turn now to the cross-bill of exceptions, in adjudicating upon which we find that the court should have granted a new trial on two other grounds, to wit, the 2d and 3d of the amended motion. By a standing

rule of the company, as may be inferred, reports by its officers and employés were to be made to it of the facts and circumstances attending accidents. This accident occurred on the 8th of February, and on the 18th of that month the superintendent prepared a report to the general manager on the subject. On the following day (the 19th) a report by the conductor, supported by his affidavit and that of several others, embracing engineer, firemen, flagman, brakeman, and another conductor, the plaintiff himself being one of the affiants, was made, and as we infer was transmitted through the superintendent, and along with his report, to the general manager. The report of the conductor cast the whole blame on the engineer, treating all the rest of the crew as faultless. These documents were admitted in evidence on behalf of the plaintiff, over the defendant's objection.

Having had their origin many days after the happening of the events to which they related, they were no part of the *res gestæ* of the cause of action on trial, but were mere narrative touching past occurrences. Consequently they do not fall within the principle of the case cited from 33 N. W. Rep. 867, (Keyser *vs.* Chicago & G. T. R'y Co., decided by the Supreme Court of Michigan in June, 1887.) Meachem on Agency, §§714, 715; Code, §2206. Nor is *Carlton vs. W & A. R. R. Co.*, 81 *Ga.* 531, a decision upon the question of their admissibility. As far as that case goes is to suggest that they were not confidential communications, but really even that question was not involved so as to render a decision of it necessary. Upon principle, we think it clear that these reports were inadmissible; and several authorities which we deem sound are to that effect. In Langhorn *vs.* Allnutt, 4 Taunt. 511, it was held that letters of an agent to a principal, in which he

is rendering him an account of the transactions he has performed for him, are not admissible in evidence against the principal. A like ruling was made in Reyner *vs.* Pearson, *Id.* 662; See also Kahl *vs.* Jansen, *Id.* 565. "Any official statement or report received by the corporation or board from one acting as officer, and accepted and adopted by them, is competent evidence against the corporation and those bound by its acts, without further proof of the appointment of the officer; but a report to a corporation or board is not made admissible in evidence against it by the mere fact that it was received and accepted by it, except for the purpose of charging it with notice of the contents." Abbott's Trial Evidence, p. 31, §62.

"An admission by a corporation of a fact or liability, duly and properly made, is of course evidence, against it; but a municipal corporation, by accepting, that is, by receiving, the report of a committee of inquiry, does not admit the truth of the facts stated therein, and such a report, though accepted by the vote of the corporation, is not admissible in evidence against it. 1 Dillon Munic. Corp., 3d ed. §305, (earlier editions, §242.)

The case of the Vicksburg & Meridian R. R. Co. *vs.* Putnam, 118 U. S. 545, was cited and relied on in behalf of the plaintiff. The opinion was delivered by Mr. Justice Gray, who devotes but a single sentence to the question, merely saying: "The reports made by the superintendent to the board of directors in the course of his official duty, were competent evidence, as against the corporation, of the condition of the road." Looking to the statement of facts prefixed to that opinion, we find it represented that "the plaintiff offered in evidence two printed reports made by the superintendent of the road to the board of directors, one in 1877, which stated that in the portion of the road where the heaviest

traffic was done, there were about thirty-five miles of
iron that had been run over for more than twenty-five
years, and required the closest attention to prevent ac-
cidents ; and the other, made in 1880, stated that there
were twenty-five miles of track made of iron forty-two
years in service, and now almost entirely worn out.
The defendant objected to the admission of these re-
ports, because they were not sworn to under examina-
tion in court; because they had no reference to the
place of the accident, but only to the general condition
of the rails ; because they could not bind the defendant
as admissions ; and because the information of the su-
perintendent as to the condition of the road was derived
in part from the reports of subordinates. But the court
overruled the objections and admitted the reports in
evidence." According to this statement, the reports
were printed, and in all probability had been promul-
gated by the company as official documents adopted by
and proceeding from it. If so, this would make them
utterances of, and therefore admissions by, the company.
Moreover, had they not been printed and promulgated,
they would have tended to show that the company had
notice of the condition of its road previously to the oc-
currence of the injury in controversy, and would have
been admissible to charge the company with such no-
tice, under the rule as above quoted from Abbott. The
reports now in question do not relate to the condition
of the road, and have no bearing upon any question of
notice to the company of any fact whatsoever prior to
the injury, their contents consisting wholly of historical
matter touching past conduct and its consequences. So
far as appears, the truth of the reports was never in
any way passed upon, adopted or affirmed by the cor-
poration ; nor were the documents printed, issued or
circulated by it as true. It surely cannot be sound law

to hold that by collecting information, whether under general rules or special orders, and whether from its own officers, agents and employés or others, a corporation acquires and takes such information at the peril of having it treated as its own admissions, should litigation subsequently arise touching the subject-matter. As well might it be considered that any and every suitor who sends out agents to discover witnesses and collect facts touching his rights or duties regarding a pending or prospective lawsuit, is to be met at the trial with the communications made by or to such agents, as admissions made by himself. Can it be possible that a collector of historical materials is to be held responsible for the truth or accuracy of them without himself having indorsed or promulgated them as true?

The case of *Krogg vs. Atlanta & West Point R. R. Co.*, 77 *Ga.* 202, was also cited and relied upon. The evidence held competent in that case consisted of declarations made by the general manager, some of them relating to the condition of the track, and some to the cause of the accident, which he attributed to too much elevation of the superstructure on one of the curves of the road. It would seem that the admissibility of this evidence was put by the court partly upon the ground that the general manager represented the corporation in making the statements, (which, by the way, were not made as reports to the company or any superior officer, but as mere oral declarations,) partly upon the ground that they were embraced in the *res gestæ*, and partly upon the ground that they showed his knowledge, and therefore the knowledge of the corporation, as to the improper construction and condition of the road before the accident. We need not comment upon this case further than to observe that its facts are so different from those of the case in hand that the one cannot

be a precedent for the other. An officer so high in power and position, and so comprehensive in his duties, as is the general manager of a railroad, might possibly be competent to affect the company by his admissions or declarations, when like admissions or declarations proceeding from subordinate officers or agents, or from mere servants and employés of the company, would be attended with no such admissible quality. Certainly this distinction could well be drawn where the declarations of subordinates, etc. were made to the company some time after the transaction to which they relate, and were elicited for the sole purpose of its own information, and for use in guiding its own conduct.

5. We see no substantial objection to the question propounded to the witness Gallagher, as set out in the 6th ground of the amended motion, the object being to show what, according to the usage and practice of the company, would have been the result had the plaintiff reported by telegraph to the train-dispatcher that the engineer was falling asleep at intervals while on his engine. In order for the jury to determine whether such a report would have been available to terminate or lessen the plaintiff's danger, it would be necessary for them to know what action would probably have been taken upon such a report. Perhaps the question to the witness could have been better shaped, but on the whole we think the court erred in not allowing the witness to answer it.

6. As there has to be another trial, we forbear to express any opinion on the correctness of the verdict. And as to the grounds of the motion not already discussed, we merely say that we have discovered in most of them no error whatsoever, and in none of them anything sufficiently material to require correction. Sev-

eral of the grounds involve, directly or indirectly, the question of duty on the part of the plaintiff to inform himself of the rules of the company and abide by them, whether they had been communicated to him or not. We agree with the trial judge that the undertaking of the plaintiff in his written application to the company for employment, to "study the rules governing employés, carefully keep posted and obey them," did not extend to any unknown rules not promulgated to him by the company. *Brunswick & Western Railway vs. Clem,* 80 *Ga.* 540-1, 5th head of the opinion. The rules of a railway company stand to its employés as laws for the regulation of their conduct, and all such laws ought to be promulgated in some reasonable, practical way. If they are written or printed, each employé should either be furnished with a copy or informed where to apply for it, or at least where he might call and read the rules or hear them read. Of course actual knowledge otherwise acquired would suffice, but it is clear to us that an employé is bound by no rule of his company which has neither been communicated to him by it, nor brought to his knowledge otherwise.

Judgment in the main case affirmed, on the cross-bill of exceptions reversed.