## 2630. ATLANTIC COAST LINE RAILROAD CO. v. McLEOD.

1. The rules of a master are not binding on his servant, unless the latter has actual or constructive knowledge of them.
2. The servant's knowledge of his master's rules may be shown by direct or circumstantial evidence.
3. It is one of the general duties of a servant to be reasonably diligent in informing himself as to what rules the master has promulgated, if any, for the doing of the work and for the securing of the servant's safety.

Legal blame may attach to a servant for not informing himself of a rule of his master relating to the servant's work and the method of performing it, where the servant has had reasonable opportunity to inform himself of the rule, and has been neglectful in not informing himself. Generally speaking, whether a servant has been negligent in this respect is a question of fact for the jury.

4. Where, in an action by a servant against his master for personal injuries, the defendant claims that the plaintiff should not recover, because of his violation of one of the rules of the master touching the particular employment, and the court erroneously excludes from evidence the proof of the formal printed rule, the error is not rendered harmless because there was evidence before the jury that the employees generally recognized a rule of practice corresponding in general detail to the requirements of the formal rule.

5. "A custom in violation of a rule, known and acquiesced in by the employer or his representatives, amounts to an abandonment of the rule to the extent to which the custom infringes the rule." Where the servant seeks to avoid the effect of a rule by showing a waiver through customary violation of the rule, acquiesced in by the master, and the contents of the rule have not been disclosed in the evidence otherwise than by oral statements as to its general nature, it is harmful error for the court to refuse to allow the master to introduce the formal printed rule, especially where the customary practice and the printed rule are such as fairly to admit of the argument that the customary practice, though somewhat violative of the express letter of the rule, was not violative of the spirit of the rule or of the main purpose disclosed on the face of the rule.

6. The court erred in excluding from evidence the proof offered by the defendant showing its formal rule which the plaintiff violated; and the state of the evidence and of the issues involved in the case is not such as to authorize this court to pronounce the error harmless.

7. Except as has been indicated in the foregoing headnotes, the trial was free from material error.

DECIDED FEBRUARY 22, 1911.

Action for damages; from city court of Thomasville—Judge Hammond. March 12, 1910.

*Bennet & Branch, Roscoe Luke,* for plaintiff in error.

*Smith, Hastings & Smith, H. J. MacIntyre,* contra.

POWELL, J. McLeod sued the railroad company for personal injuries—the cutting off of both of his legs—and recovered a verdict for $28,000. There are many exceptions in the record, but as for the most part they present no new questions, and as an elaboration of the points would not be of general professional interest, we shall pass all of them by, with the exception of one point which we are about to discuss at length, with the general statement that there is no reversible error complained of. However, in order

to understand the point upon which the judgment of the lower court is reversed, it will be necessary to state the facts somewhat at length.   McLeod was employed as an inspector and car repairer in the defendant company's yards and shops at Thomasville, Ga.   On the date of the injury complained of, an inspector had placed upon a car located on what is referred to in the evidence as track No. 2, in the Thomasville yards, a card indicating that it was in bad order in respect to one of its bumpers or coupling apparatus.   The general foreman of the shops sent McLeod to examine this car, and to make the repairs on the track where the car was located, if the repairs were of such a nature that they could be made there. The car was situated on a track running east and west.   McLeod approached it from the east end, went around on the north side to the west end, inspected the bumpers there, then came around by the south side, looked under the car at the southeast corner, and came back around to the northeast corner of the car, and finding that the repairs were to be made at that end of the car, stooped down astride the rail—that is, with his right foot outside and his left foot on the inside of the rail—and with his head under the car, in order to make certain measurements.   While he was in this position, a switch engine, with several cars attached, backed onto the track on which this car was located, and "kicked" one of the cars attached to this train, so that it ran back and bumped into the car under which McLeod was working, causing it to knock him down and run over his legs.   In the Thomasville yards of the defendant company the main line track from Savannah to Bainbridge runs east and west, but at a point a few hundred feet west of where this car was standing the Albany branch line runs off to the northward, but by a system of switches connects into these tracks which run east and west; and the engine and cars which backed into this track No. 2 where the plaintiff was working came from this Albany branch.   The plaintiff testified that before he went under the car he looked to the west and to the northwest to see if any train was coming; and as he expected to be under the car for only a few seconds, and knowing that under the rules of the company no train had a right to approach at a greater speed than 8 miles an hour, he felt safe in going under the car, because there was no train in sight, and he could see such a distance as to prevent any train, not violating the speed rules, from getting to where he was before he

would be out from under the car again.  It was not necessary for him to protect himself from the eastward, as the track on which he was working was a spur ending at a dead block a short distance away.  He put up no blue flag as a danger signal, as he expected to be under the car for only a few seconds.  He testified that he was under the car not exceeding 20 seconds before he was struck and injured.  There was also testimony that the car which struck him was running 12 or more miles per hour.  However, as to the speed of the car there was a conflict of testimony; certain railroad employees testifying that when the car was cut loose from the backing train which "kicked" it, it was running not exceeding 4 or 5 miles per hour, the cutting loose and the "kicking" having occurred at a point estimated as being three or four car lengths from where the bad-order car was standing.

One of the chief defenses of the railroad company was that the plaintiff was not free from fault; that, before going under the car, it was his duty to protect the car by the display of a blue flag at the end of the car.  Much evidence was introduced touching this duty and the custom of the employees as to displaying a blue flag when they were doing work of inspection or repairing.  The plaintiff, it appears, had been in the employ of the defendant company for about 10 months.  As to the use of the blue flag, he testified that he had been using one that morning to protect a car on which he was working and from which he was called by the foreman to do this particular work.  Further testifying, he said: "The purpose of this blue flag was to show the switchman that men were working on that car and in a dangerous position.  A blue flag stationed near a car means that somebody is under or around that car in peril, and it is a warning to show that some one is in or around, under, or between these cars, and is to be there for some length of time.  It is a warning that somebody is in a perilous position, and it must not be moved. . . I have been working on cars in this yard for eight or nine or ten months, and have been using the blue flag for this purpose during the whole time.  I used a blue flag for that purpose because it was customary.  It is not a fact that Mr. Kirkland [the shop foreman] instructed me as to the use of the blue flag, neither did Mr. Wheeler [another foreman].  He never gave me any instructions at all about a flag, and I never had any conversation with him, nor Mr. Wheeler, about the use of the

flags. I had the conversation about the use of flags with repair men that I was at work with. . . They said it was strictly against the rules to pull that flag up and run over it, and it was there to protect car repairers, to prevent the switching crew from coming up there. The blue flag was used to protect men at work where it was posted, as a warning that the men were at work there. . . I saw it was the custom soon after I went to work in the shop. I never heard anybody say that was the rule. I suppose there must have been a rule about it. I naturally came to the conclusion that it was against the rule to pull them down, and that it was the rule to put them up. . . I did not carry a blue flag when I went to this car, and I did not have one displayed at either end of the car. I have never seen any printed rules of the Atlantic Coast Line Railroad Company or any general rules. I have never read any printed rules for the governing and protection of car inspectors or repairers. I knew from what others did, and what I heard discussed by my fellow workmen. I did as the balance did in the yard. . . We never used a flag when inspecting a car. It was not customary. . . The purpose of putting up a blue flag was to protect those who were working on the car, who were going to be there long enough for them to be in danger. . . Mr. Kirkland never gave me instructions about the use of the blue flag."

Kirkland and the other foreman testified that they had instructed the plaintiff as to the use of the blue flag, but neither they nor any one else testified that the plaintiff had been furnished a copy of the rule book. These foremen also testified that, as a matter of custom, inspectors, in making ordinary inspections, did not protect the cars they were inspecting with blue flags, but that repairers did. It was explained by the witness Kirkland in this connection, however, that "it is not necessary for a man to go under a car to inspect it. The inspector never goes under cars to inspect them when they come in. It is not necessary. He inspects one side, and goes around it without getting under it. An inspector can without putting his head under a car see the condition of the draft beam, but as a rule they do put their heads under without putting out a blue flag. We had not prior to August, 1909, been using the blue flag to inspect trains. On January 4, 1909 [the date of the injury], and prior to that time, the practice in the yard

when simply an inspection was being made, they had not used the blue flag." The foreman further explained that the doing of such work as McLeod was doing at the time of the injury was not included in his meaning of the word "inspection;" that by "inspection" he meant when a man met a train and looked over the journal boxes, draft gear, drawheads, etc. He further testified that it was customary for car repairers to use blue flags at all times. He further said: "A man just inspecting cars, not doing any actual work on it, would use judgment about putting out flags. It would not be necessary to put up a flag to make a little inspection. To inspect the whole car, of course, would be different. . . There was no regular practice to put out flags when the car repairers did inspection work."

With this testimony in, the defendant offered the rule book of the company which had been duly identified by the witness as containing the rules in force at the date of the plaintiff's injury. The rules material to the present discussion, and which were specially offered, were as follows:

"(26) A blue flag by day and a blue light by night displayed at one or both ends of an engine, car, or train indicates that workmen are about or under it. When thus protected it must not be coupled to or moved. Workmen will display the blue signals and the same workmen alone are authorized to remove them. Other cars must not be placed on the same track so as to intercept the view of the blue signals without first notifying the workmen."

"(988) They will, when inspecting or making repairs to cars, protect themselves by placing a blue signal on each end of the car or train as per rule No. 26.

"(989) They will make no inspection or repairs to cars either in trains or where liable to be moved, except under the protection of the signal prescribed in rule No. 26."

The court rejected these rules from evidence, and it is upon the ground of the motion for new trial complaining of the exclusion of this evidence that we hold that the judgment must be reversed and a new trial granted. As we shall presently attempt to show, the rejection of this testimony was error, and, as the evidence was material upon the two most vital points of the case—the negligence of the defendant and the contributory negligence of the plaintiff— we see no way of escaping the conclusion that it was harmful error,

such error as to leave this court no alternative but to award a new trial. We are informed from the argument that the judge, who in other respects so fairly and learnedly tried this case throughout a long and closely fought trial, excluded these rules from evidence on the ground that it was not shown that they had been communicated to the plaintiff.

We understand the law to be that "an employee of a railroad company is not bound by any rule, regulation, custom, or usage, not communicated to him, or furnished to him, or spoken or told him, and of which he had no knowledge and of which he could get no knowledge by the use and exercise of ordinary care and diligence." *Little* v. *Southern Ry. Co.*, 120 *Ga.* 347, 352 (47 S. E. 953, 955, 66 L. R. A. 509, 102 A. S. R. 104). The second headnote of that case states this proposition somewhat more broadly in favor of the employee, as it omits express reference to the proposition that the employee might be bound by a rule of which he had no actual knowledge, but of which he could have obtained knowledge by the use of ordinary care and diligence. But by examining the opinion itself it will be found that the trial court used the language just quoted, and that the employee in that case, having failed to recover, brought the case to the Supreme Court, assigning error upon this charge, on the ground that the law does not impose upon the employee the duty of exercising ordinary care in ascertaining the rules of the company. The court, after plainly holding that the correct rule does contain this element, cites in support thereof the cases of *Port Royal R. Co.* v. *Davis*, 95 *Ga.* 292, 299 (22 S. E. 833), and *Carroll* v. *East Tenn. etc. Ry. Co.*, 82 *Ga.* 452 (10 S. E. 163, 6 L. R. A. 214). In *Port Royal R. Co.* v. *Davis*, supra, the judgment was reversed because the court erred in restricting the defense of violation of rule to such rules as had been promulgated and brought to the actual knowledge of the employee. That the rule as thus announced in this State is the rule as generally recognized, see Labatt on Master and Servant, § 227.

In the case at bar the injured employee had been working at this particular occupation for the space of 10 months. As a witness, he conceded that he supposed that there was a rule upon the subject, that what he had seen in practice and what he had learned from other employees had led him to believe that there was a rule upon the subject; and, while he said that he had never seen the

printed rule, he gave a very accurate description of its contents and legal effect. One of the duties resting upon every servant in every employment—a duty arising by implication out of the contract of employment—is that the servant will use ordinary care and diligence in informing himself as to such features of his master's business as will enable him to carry on the work with reasonable safety and at least ordinary competency. Therefore, in a case where the master claims that the servant has been guilty of contributory negligence because he has violated a rule, it is not absolutely incumbent on the master to show expressly that the rule had been communicated orally or in writing to the servant, before he can insist that the question of the servant's negligence in violating the rule shall be submitted to the jury. If the master shows express promulgation and communication of the rule to the servant, and shows the servant's violation, and then makes it appear that the violation of the rule materially contributed to the servant's injury, he makes out what is as a matter of law contributory negligence on the servant's part. On the other hand, where the communication to the servant is not expressly shown, and the master relies either upon circumstantial evidence to establish the servant's knowledge or seeks to charge the servant with constructive knowledge of the rule, contributory negligence can not be predicated as a matter of law. The question then goes to the jury for their solution as to whether the servant is reasonably to be charged with knowledge of the rule or with blame for not informing himself as to the rules which are to govern him in doing the work and which are supposedly designed to make his work safer. Negligence per se can not be asserted of a violation of a rule, unless it be shown that the servant knew the rule; but a servant may be considered as blameworthy (and, therefore, not free from fault) because he has failed to inform himself as to a rule after he has had reasonable time and opportunity to know it. So that it seems to us that it was the duty of the court to admit the proof of these rules, and to let the jury decide whether the plaintiff had knowledge of them or was at fault for not having knowledge of them. This cause of action arose under the old law which allowed a servant complaining of the negligence of a fellow servant to recover only on condition that he himself was free from fault.

For another reason we think that the rules should have been

admitted, irrespective of the extent of the plaintiff's knowledge of them. One of the allegations of negligence made in the petition and submitted by the court to the jury as a part of the plaintiff's case was that the servants of the defendant company in charge of switch engine and cars were negligent in shifting the train and in "kicking" the loose car back against the car under which the plaintiff was working, without first ascertaining whether some one was under that car or not. In the light of the rule which we have before us, the natural answer of the defendant to this charge of negligence against its trainmen would be that the reason that these employees did not look under or about the car to see if some workmen were there was that the rules required that a blue flag should be displayed when workmen were under cars, and that, when they looked and saw no blue flag displayed, they indulged the natural inference that there was no danger in "kicking" back against the car, and that there was nothing in the situation which made it negligence, in the absence of a blue flag, to fail to look under and about a car for the presence of other employees. In other words, under the charge of the court as applied to the petition in the case, the jury were allowed, if they saw fit to do so, to hold the defendant liable because its trainmen did not take steps to ascertain if the plaintiff or some one else was under the car, and refused to allow the defendant to show what must have been the most natural and reasonable excuse on their part for not examining the car, namely, that the rules of the company required a blue flag to be displayed when there was danger from such moving of the cars, and, therefore, that it was reasonably prudent on their part to act on the assumption that no one was under or about the cars, unless the blue flag was displayed. So that these rules were relevant, not only toward establishing negligence on the part of the plaintiff, but also as tending to relieve the defendant's other servants from an imputation of negligence as to at least one of the charges of negligence made in the petition and submitted to the jury.

Able counsel for the defendant in error, while contending that there was no error in the rejection of the rules, further insist that even if there was error in rejecting them, the error was harmless for several reasons. First, they say that there was ample evidence before the jury to authorize them to find that there was a rule on this subject (so as to make the introduction of the printed rule

redundant, so to speak), but that the rule had been so far disregarded, with the acquiescence of the company, as to relieve the plaintiff from an imputation of negligence in failing to use the blue flag under the particular circumstances surrounding him at the time of the transaction. In *Schaufele* v. *Central of Ga. Ry. Co.,* 6 *Ga. App.* 660 (65 S. E. 708), we undertook to discuss the double meaning of the word "rule," and to show the confusion that has sometimes resulted from the ambiguity. As there pointed out, "by the rule of the master, the violation of which renders the servant ipso facto negligent, is meant, not the general course or practice by which the work is usually done, but an explicit promulgated regulation or mandatory instruction." It was further said: "Proof of a general understanding among the employees that a certain rule (in the sense of a formulated rule) exists is not the proper method of showing the existence of the rule, though proof that a cautionary rule (in the sense of practice) is generally pursued by the employees in doing a particular kind of work may be relevant as tending to establish a standard of common prudence." We held, also, that the defendant was not entitled to an instruction that the plaintiff could not recover if he violated the rule there in point, because it was ambiguous, under the evidence, whether the testimony of the witnesses related to an express promulgated rule or to a practice of employees which they referred to as the rule. In the case at bar, if the court had permitted the defendant to introduce these rules, the plaintiff, by timely written request, could have required the court to charge the jury that, if they believed that the injured employee had knowledge of these rules and had violated them, he would be ipso facto guilty of such negligence as would bar his recovery, unless, of course, it appeared that the company had permitted such a course of violation as to abrogate the rule; but without these formal rules in evidence, such a request would have been properly declined, under the authority of the case just cited. We think that it will be readily conceded that in a case like this the strength of a defense is vastly diminished when it is reduced from a defense which is as a matter of law perfect to a defense which must be submitted to a jury for their determination. And an error which thus robs a defense of so material an element of defensive value can not be said, with any degree of fairness, to be a harmless error.

Further, the plaintiff's contention that the defendant through a course of permitted conduct had waived its right to insist upon the formal rules made it the more essential that the defendant should have the rules themselves before the jury. When the testimony of the defendant's foreman, Mr. Kirkland, is considered in connection with the rules themselves and a comparison of the one with the other is made, there is much to draw one's mind to the conclusion that the line of practice which the witness stated had been indulged in was simply that practice which a proper interpretation of the rules themselves would have warranted. The plaintiff argues that the rules required the use of the blue flag by both inspectors and car repairers, and that, inasmuch as inspections were frequently and constantly made without the use of the flags and as the company had acquiesced in this practice, it had abrogated the rule. Viewing the printed rules as a whole, we think that it would be fair to interpret them, not as requiring inspectors to use the flags at all times, but as requiring this precaution only at such times as they might place themselves under or about cars in such a way as that a movement of the cars would likely injure them. The reason of the rule is disclosed in the rules themselves; and the practice which the witness Kirkland speaks of would not for the most part be violative of the spirit of these rules. When Kirkland said that inspectors were not required to use flags in making inspections, he defined the meaning in which he was using the words "inspectors" and "inspections," and with tolerable clearness indicated that what he meant to say was that such inspections as were superficial, or could be made without putting the inspector in the range of danger from the moving of the cars, were customarily made without the use of the flag, and that other activities than those of this nature, whether called inspections or repairing, were not customarily made without the car's being guarded by the blue flag. As the plaintiff's right to recover turns so largely upon a waiver of these rules, and as the testimony of the defendant's own foreman tended somewhat to show that there had been a waiver, it was very important to the defendant to show that the spirit of the rule—the real thing required by the rule—had never been waived as a matter of practice.

Another reason asserted by the defendant in error as to why the exclusion of these rules was harmless is that it is plain from the

evidence that if the defendant's trainmen had not been operating the engine and cars at a rate of speed beyond that which was allowed by the rules, thereby rendering themselves negligent, the injury would not have occurred, and that the plaintiff had a right to assume that they would not act negligently. It must be remembered, however, that one of the very objects of the master's promulgating rules, especially in those employments where under the law the master is liable for the negligence of fellow servants, is to make each servant so conduct himself that, even if another servant is negligent, he will not be hurt. If the master has given to his servant a rule which, if he had followed it, would have protected him from injury notwithstanding some other servant's negligence, and the first servant breaks the rule and is injured as a result of the fellow servant's negligence, he can not be held as a matter of law to be free from blame, on the theory that it was not his duty to anticipate the negligence of the fellow servant. Further, the evidence does not at all demand the finding that the trainmen in this case who "kicked"˙ the car were operating their train at a greater speed than that allowed by the rules, namely, at eight miles per hour; and, in view of the fact that the court submitted to the jury other allegations of negligence than those based on the speed at which the train was operated, it can not be said that the verdict of the jury is necessarily a finding on the issue of fact that the train was operated at a greater speed than that allowed by the rules. The verdict might have been rendered on the theory that the petition charged as one of the acts of negligence a failure to warn the plaintiff of the approach of the train, and that the jury adopted· this view. Likewise, it is charged as an act· of negligence that the employees in charge of the train ought to have anticipated the presence of the plaintiff under the car, and the jury may have taken this view. While there was ample evidence from which the jury might have inferred that the train was being operated in violation of the rules, on the other hand there was much direct testimony and circumstantial evidence tending to show that the train was not being operated at a rapid rate of speed. For instance, there was testimony that the conductor or yard foreman was sitting upon a flat car in the train at a time when it was within four car lengths of where the car under which the plaintiff was working was located, and he jumped off the car in order to give the signal to the

engineer for the purpose of making the "kick." The switchman uncoupled the cars in order that the "kick" might be made, he being on the ground at the time, and, if the train had been running at a very great rate of speed, he, on foot, could hardly have effectuated the uncoupling in this manner. The engineer and the yard foreman who was controlling the movements of the train both swore unequivocally that, if the blue flag had been displayed, they could easily have prevented the collision of the two cars and would have done so. We can not say, therefore, as a matter of law, that the failure of the plaintiff to display the flag did not contribute to his injury, or that the injury would just as certainly have ensued if the flag had been displayed. According to the plaintiff's testimony, the jury might have inferred that the train was coming at such a rate of speed that, even if the blue flag had been displayed, the cars could not have been stopped, in rounding the curve from the Albany track, in time to prevent them from striking the car under which the plaintiff was working; but, when we consider the question as to whether an error in the rejection of testimony is harmless, it is, of course, proper that we should construe the testimony relating to the matter most favorably to the party against whom the error has been committed.

Considering the matter all in all, we have reached the conclusion that the rejection of these printed rules was error, and we are unable to find in all the circumstances of the case sufficient reason for saying that the error was harmless. This court has a fixed policy of not reversing judgments for harmless error, but, as we have said in previous cases where this doctrine has been invoked, it is a doctrine which must be cautiously applied. After a full consideration of the present record, we can not satisfy our minds and consciences with any degree of certainty that juridic justice had been fully accomplished in this case—that the right end has been unquestionably reached. We say this without regard to the size of the verdict; for, while it is large, we are not willing to say that it is legally excessive, and the mere fact that a verdict is large is no reason for this court's setting it aside, if the trial has been free from error likely to affect the size of the verdict. For the error pointed out, an error which goes to the case as a whole, we reverse the judgment of the trial judge in refusing to grant a new trial.

*Judgment reversed.*