THE CENTRAL RAILROAD AND BANKING COMPANY *v.* RYLES.

1. Though ordinary care as a legal standard for the measure of diligence is invariable, yet, as the conduct of a prudent man varies with the degree of danger attending the vocation in which he is engaged and is more or less cautious according to circumstances, those who are bound to conform their conduct to his must graduate it in like manner. This applies both to one exposed to danger, and to others not so exposed whose acts or omissions affect his safety.

2. The rules of a railway company for the government of its employés are not obligatory as such upon those who are not aware of them and to whom they have not been promulgated.

3. The injury involved in the case having been received by the subordinate while acting under orders from his superior, his habit to act hastily and needlessly upon other occasions was not sufficiently relevant to be admissible in evidence.

4. The opinion of a witness that the backing of the train was very carefully done, and that nothing was done carelessly or negligently, was not admissible.

5. Though the verdict is not altogether satisfactory to this court, inasmuch as it was rendered by the jury and approved by the presiding judge, and is not palpably unwarranted, it is left to stand.

February 24, 1890.

Railroads. Negligence. Charge of court. Evidence. Verdict. Before Judge GUSTIN. Bibb superior court. May term, 1889.

Ryles sued the railroad company for damages sustained by him while employed as a train-hand, in coupling cars of a freight-train known as number 39. He

alleged that there were five loaded cars on the siding at Bartow, to be attached to number 39, and it became his duty to make the necessary couplings; the engineer was ordered to back his engine, with twelve cars attached, to the cars on the siding; it then became the duty of the company to provide a lookout and guard so as to signal to the engineer, that the couplings might be safely made, but no one was so provided to give the necessary signals, warning the engineer of his proximity to said five cars, so that he could regulate the speed of his train to that degree proper for the safe coupling of said cars; and in consequence of said neglect, the engineer backed the cars attached to his engine at a speed of ten miles per hour, whereby, when plaintiff came to couple the cars, he was unable to perform said duty without danger to himself, which fact was not known to him until after the injury hereinafter set out. He had no means of determining the rate of speed at which the train was moving, nor did he know or believe that the coupling could not safely be made to a train moving at that rate of speed. He went in between the cars at the proper time to make the coupling, and believing that the proper signals would be given for the engineer, proceeded to make said coupling, when the moving train collided with said five cars with such force and rapidity that, without any fault on the part of plaintiff, his right hand was caught between the bumpers and his thumb and first and second fingers were mashed and the bones of his hand bruised. Had the proper signals been given, which he had a right to expect would be given, so that the engineer could have regulated the speed of his train to the proper degree, plaintiff could have performed said coupling with safety to himself. The injury was occasioned entirely by the fault and negligence of defendant, and without any fault whatsoever on the part of plaintiff. His crushed thumb and finger were amputated; he

suffered great pain; incurred expenses; sustained permanent injury and disfigurement, etc.; and has been damaged $5,000.

The testimony for the plaintiff tended to show the following: He was twenty-two years old at the time he sustained the injury; he had been engaged as a train-hand on the train in question two weeks, having been employed by its conductor, Kelly. He had never been engaged in any railroad work before, and Kelly knew he had no experience in it. Coupling cars was a part of his duty. Kelly gave him no instructions, except to tell him what work to do. As conductor, Kelly had full charge of the train and the train-crew. There were two other train-hands besides plaintiff, one named Smith who also was inexperienced (which Kelly knew), and the other named Parker who was experienced. The engineer was named Riddick, and the fireman Foran. Some cars were standing on the side-track by the warehouse or depot at Bartow, a station on defendant's road, to which cars it became necessary to couple the engine and cars of the train on which the plaintiff was employed. He was directed by the conductor to make the coupling; he went in to do so when the moving cars were about two car-lengths away. There was nothing that he saw to indicate that there was any danger in his going in to make the coupling at the time. He set the pin in one of the stationary cars and went to meet the cars that were coming back, and came on back with them. It was the conductor's business to give the signals to the engineer "as to how slow or fast or how close they were," and plaintiff was relying upon him and Parker to give proper signals. He could not see any of them. The siding was slightly curved at the point where the coupling was to be made and for some little distance on either side. There were ten or twelve cars between plaintiff and the engine. He was hurt because the en-

gineer drove the train back too fast.  He walked back
with the moving cars to meet the stationary cars, and
" they came back right together " before he could even
have time to think.  His right hand was so badly
mashed that an amputation had to be performed, by
which he lost the thumb, index finger and middle finger,
and all that part of the palm extending from the base
of the third finger in a straight line to the wrist.  He
suffered greatly at the time, and suffered with the hand
for sixteen days afterwards.  He had to procure medi-
cal attendance at an expense of $135.50.  He was get-
ting at the time $36.60 a month wages.  His expectancy
was a little over 40 years; and he testified that his ca-
pacity to labor had been interfered with to the extent
of very nearly half.  If the signals had been given prop-
erly and obeyed correctly, he could have made a safe
coupling.  His hand was caught between the bumpers
when the cars first came together, as he was in the act
of making the coupling.  When he was employed, he
was given no instructions as to how to make a coupling;
he was not furnished with a stick or anything of that
sort; he had never received any instructions to make a
coupling with a stick.  He testified that he could have
done nothing to have prevented the injury that he did
not do, except that of course if he had not gone in to
make the coupling he would not have received the in-
jury.  He saw the cars coming back and saw how fast
they were coming, but did not know exactly at what
speed.  His hand was under the link, next to the bot-
tom side of the bumper, when it was crushed, and he
was so holding the link as it struck in the bumper.
When the cars came together, those which had been
stationary were knocked back four or five feet up grade;
his hand fell out; and he was bumped up between the
cars two or three times before he could get out.  His
hand was not hurt when the cars rolled back, and he

has never said that he got his hand caught when they rolled back. On the day he was hurt, Parker told him to look out for himself, and Kelly told him to be careful and at the same time told him to make a coupling. Kelly did not tell him to use a stick, and he did tell Kelly that he had to learn something if he was a railroad man and he had as well learn then as any time. This occurred before he was hurt, about twenty-five miles up the railroad. Kelly told him to make every coupling that he made. Plaintiff did not frequently run down and take Parker's place in coupling cars. When he was employed, Kelly did not tell him that it was dangerous service; but he knew from what he had seen that it was. He did not know what the rules were about using a stick. He did not have a rule book nor a copy of the rules; he never asked for one. He never saw other people use sticks; used a stick for coupling once himself, but that was only a piece of pine which he had picked up on the side of the road. He never saw the rules. He had an idea the company had rules by which to run the train, but they did not tell him. He never got any; Kelly never told him it was his duty to apply and get them, nor did he know from Kelly or any person that he could get them by applying to the yardmaster. When his hand was caught, immediately, as soon as he saw the proud flesh, he cried out loudly enough to be heard by anybody within a hundred yards. When he was hurt, Smith was trying to give signals to the fireman, but was in such a position that the fireman could not see them. The conductor had gone into the warehouse, and did not come out until after plaintiff was hurt. He gave no signals to the engineer about coming back. Parker was walking alongside of the engine, and he and plaintiff could not see each other. The conductor could not have given the signals from the warehouse so as to be seen by the engineer. Plain-

tiff did not, soon after he was hurt, say to Kelly in the presence of Evans and Parker that he did not blame Kelly nor any of the train-hands, nor anything of the kind; nor did he tell Kelly that he wished somebody would kill him (plaintiff). The rebound of the train did not catch his hand but it bumped him against the cars, and he was struggling trying to get out; he did not attempt to make any coupling when it came back. He did not step away and get out when the cars first rolled and came back, because he did not have time to do so. The following rule was of force: "The conductor will have the entire management of his train and the hands employed upon it. He will be held responsible for the movement and position of his train at all times. He will see that his cars and all their necessary appurtenances are in perfect order."

Testimony for the defendant: Kelly was near the cars, on the warehouse platform; did not see plaintiff when he was injured, but heard him when he cried out, and this was when the cars which had been struck by the moving cars rolled back to them, not when they were first struck. Kelly was careful about plaintiff, who seemed to be a nice young man and stuck to his work, and when he commenced coupling cars he learned fast, and Kelly cautioned him about coupling, and told him that was where all the danger lay in railroading. He said he had to couple them sometime, and Kelly told him not to be in a hurry, he would learn. Parker was on a flat car giving signals, and Kelly was signalling from the platform to the fireman, who was on the engine. Kelly could see him, and gave a half-car signal, and the signal usual when cars came together. Shortly after plaintiff was hurt, he said he wanted somebody to kill him; that he had no blame to attach to Kelly or any of the train men, and that he "had it right that way" (indicating) "when he got hurt, and the car rolled back and

caught his hand." The train was going from three to four miles an hour at the time it came back for plaintiff to make the coupling. Kelly had cautioned plaintiff two or three times not to be too anxious to couple cars, and on the day he was hurt told him not to be fond of doing so, but until he could learn how, to let Parker do it; and plaintiff replied that he had just as well learn then as any time. Parker mounted some flat cars which were attached to the engine, to make a coupling himself, and rode back towards plaintiff, and was on the flat car signalling the fireman when the plaintiff was hurt. Gave the fireman signals of two car-lengths, one car-length, a half car-length, and when he was within five feet of the car (about the time plaintiff went in), signalled him down. He had his head out looking towards Parker. The signals must have been received, for the speed was slackened as if they had been. Parker heard nothing about using a stick; is an experienced car-coupler, and never uses a stick, though he has been furnished with one by the yard-master at Savannah, which he used sometimes and sometimes he did not; it was as well to couple without a stick as with it. If a man had a stick, he would not get his hand mashed. Parker did not see Kelly. There was one car between witness and plaintiff. The rule is that it is the business of the conductor to be present and see that couplings are properly made. It is important that the man who is giving the signals should know the position of the coupler and should see and know how the cars are approaching, and how far apart they are, in order to signal. It is not important to know the position of the car-coupler and the cars, all the time. Parker does not think if he and the conductor had been down on the ground opposite where plaintiff was, they could have given the signals better than from where he was signalling. The proper signals for making the

coupling were given. They came back and made a
pretty hard coupling; Parker made several that day just
as hard. By a hard coupling he means that the speed
was between three and four miles an hour. The engi-
neer took the signals from the fireman; did not remem-
ber what signals he got, but the fireman said " two car-
lengths," and when he got a car's length said " hold so,"
and then the engineer stopped. He could not see the
signals himself on account of the curve. Felt two con-
cussions when the cars came together, and it was after
the second concussion that plaintiff cried out. He
was not hurt when the cars first struck together, but by
the rolling back of the stationary cars after they were
struck. The conductor was on the platform talking to
the station master, who was reading way-bills, standing
between the conductor and the engine, and did not at
any time see him give any signals. But the fireman
received the signals from him and gave them to the en-
gineer. They were obeyed and followed by Parker and
plaintiff. The engine was moving very slowly when
they were given. To one question witness Foran an-
swered: " The signal I received was to move back half
a car-length. The movement was very slow. It was
very carefully done." (The last sentence the court ruled
out.) The conductor was standing on the ground about
two car-lengths from the engine. It is not true that
Parker was giving signals; he was making a coupling
at the time. The engine was under full control. Two
cars were between it and plaintiff. It was more diffi-
cult to couple cars on the curve than on the straight
track; this fact ought to be known by all experienced
railroad men. It is the duty of the conductor to stand
near the train-hand on the outside of the car and give
his signals to the men on the engine. It is his duty to
give proper signals and see everything properly done.
He was in charge of the train and had control of it.

The following rule was of force : " Those persons whose duty it is to couple cars will be supplied by the yard-master with hand-couplers, which will avoid the necessity for using their hands between the bumpers.; and it will be the duty of persons in this service to apply to the yard-master for same.   They will be charged with those lost, but new ones will be issued on return of those worn out."

The jury found for the plaintiff $5,000.   The defendant moved for a new trial on the grounds that the verdict was contrary to law and evidence, and excessive ; because of errors in the court's charge, and in the exclusion of evidence, as set forth in the first, third and fourth divisions of the opinion ; and because of error in charging as follows: "With reference to any rules of the company requiring a duty to be performed in a particular manner, I charge you that if the railroad company establishes such rules, the burden is upon them to show that such rules have been communicated to the employé, or that he has had a reasonable opportunity of finding out such rules; and that if they have not been communicated to him or that he has not had reasonable opportunity of finding them out, then he would not be bound by them.   It is the duty to promulgate and make known such rule."   Also because the declaration alleges as the negligence of defendant the failure to have a proper person to give signals to the engineer and the failure to give the proper signals, and charges nothing else as negligence ; and the verdict is contrary to the weight of evidence and without evidence to support it on this question of signals to the engineer ; and under the pleading, no verdict for the plaintiff could be supported on any other alleged negligence.   The motion was overruled, and the defendant excepted.

R. F. LYON, for plaintiff in error.
DESSAU & BARTLETT, *contra.*

Bleckley, Chief Justice.

1. The code, §3033, is in these words: "A railroad company shall be liable for any damage done to persons, stock, or other property, by the running of the locomotives, or cars, or other machinery of such company, or for damage done by any person in the employment and service of such company, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company." The court instructed the jury expressly that "If the defendant has made it appear that its agents or employés, at the happening of the injury and in and about the service resulting in the injury to the plaintiff, exercised all ordinary and reasonable care and diligence, then the plaintiff is not entitled to recover." The duty of the plaintiff to be free from fault was also covered by the charge. It is complained that the court, after charging the jury " that any one entering the employment of a railroad company enters it undertaking to bear all the risks incident to that employment," then erred in charging as follows: "'That if it is of a dangerous character, he bears the risks incident to an employment of a dangerous character, and that the more dangerous the employment is, the greater care he is required to take while engaged in that employment; but that carries with it also the obligation on the part of the other employés of the railroad company to exercise greater skill and care on their part. If the employé is put to perform a dangerous duty, and there are certain duties resting on the other employés to protect him or give warning or anything of that kind in connection with that duty, the more dangerous the duty the greater care and skill is required on their part. If in connection with a duty to be performed by any employé it is the duty of other employés to give warning or to give direction, the more dangerous his duty is,

the more careful they should be in the performance of theirs."

The standard of ordinary and reasonable care is invariable, such care being that of every prudent man. Code, §2061. But the care of a prudent man varies according to circumstances dependent upon the degree of danger. Beach on Contrib. Negl., p. 22; 2 Thomp. Neg. 982, §11 and notes; Deering on Neg. §§7, 210; Wharton on Neg. §§47, 48 *et seq.;* Cayzer *v.* Taylor, 10 Gray, 274; Morgan *v.* Cox, 22 Mo. 373; Nitro-Glycerine Case, 15 Wall. 536, 537; Wabash R. Co. *v.* McDaniels, 107 U. S. 454. "What is the precise legal intent of the term 'ordinary care' must, in the nature of things, depend upon the circumstances of each individual case. It is a relative and not an absolute term. Chancellor Walworth, in the case of the Mayor, etc. of New York *v.* Bailey, says: 'The degree of care and foresight which it is necessary to use' (in any given case) 'must always be in proportion to the nature and magnitude of the injury that will be likely to result from the occurrence which is to be anticipated and guarded against. And it should be that care and prudence which a discreet and cautious individual would, or ought to, use if the whole risk and loss were to be his own exclusively.' This doctrine is declared in many other cases. He who does what is more than ordinarily dangerous, is bound to use more than ordinary care, that is to say, it will require greater care under those circumstances to amount in law to ordinary care than it would if the undertaking were less hazardous. And the measure of diligence required of him is greater or less in the direct ratio of the risk his acts entail upon others. The duty of a plaintiff is to be measured by the same rule that is applied to a defendant, and just in proportion as the danger increases must the care of the plaintiff be increased, if it is to be held ordinary care under the circumstances. It is clear

that what might be entirely prudent in one condition of things would be reckless and grossly negligent in another." Beach on Contrib. Neg., *supra.* It thus appears that, whilst ordinary care is the standard, what amounts to such care depends upon the danger and other circumstances involved in the particular case. This doctrine the court recognized in its charge, and applied it to the conduct of both the plaintiff and the other servants of the defendant connected with the case. It seems to us that there was no error in so doing. What has been said disposes of the second ground of the motion for a new trial as well as the first.

2. The third ground of the motion, touching the promulgation of rules, is free from error. *Brunswick & Western R'y Co.* v. *Clem,* 80 *Ga.* 534, 541 ; *Carroll* v. *East Tennessee, etc. R'y Co.,* 82 *Ga.* 452.

3. The exclusion of evidence to show that "Ryles, the plaintiff, was in the habit of going in between the cars to make couple of the cars unnecessarily ; that he would go in without being told to do so; that he would frequently run in to make the coupling and take the coupling away from Parker, who was an expert ; that he was too quick in attempting to make couplings,—all at other places and on other occasions than this, but along this line of road and while engaged in this service," was not error. In this instance Ryles was not acting under his general habit, but under the orders of the conductor. He was told to make the coupling and, whether he was too quick or not in ordinary cases, he was not more quick in this instance than his duty in obedience to orders required of him. It would seem that a man's habit to act precipitately should not prejudice him when his duty to act has been determined by a superior and not by himself.

4. That the backing of the train " was very carefully done," was matter for the judgment of the jury, and

not for that of the witness.   There was no error in ex-
cluding this part of the testimony of Foran.   The same
may be said as to the exclusion of the testimony of the
same witness to this effect that "There was nothing
done by any of the employés carelessly or negligently,
that would produce the injury to the plaintiff."

5. If we were trying the case, we might be much per-
plexed, even distressed, to arrive at the verdict which
the jury rendered.   But we must be mindful of the dif-
ference between their province and our own, and as the
trial judge was satisfied with the verdict, our dissatis-
faction with it, not being in a higher degree than it is,
is of no consequence.   We cannot pronounce that any
error was committed in overruling the motion for a new
trial.                                  *Judgment affirmed.*