THE CENTRAL RAILROAD COMPANY *v.* SUMMERFORD.

1. Though the existence of the stock law is pertinent and may be material on the question of ordinary and reasonable care and diligence in guarding against killing stock by the running of trains, yet a request to charge in general terms that a less degree of diligence is required in a county where that law prevails than in a county where it does not, may be declined. The court may also decline a request to charge that a less degree of diligence in looking out for stock is required while running through a field than while running through lands unenclosed.

2. The evidence warranted the verdict.

July 13, 1891. By two Justices.

Negligence. Stock law. Railroads. Charge of court. Verdict. Before Judge FORT. Lee superior court. November term, 1890.

Summerford obtained a verdict against the railroad company for damages from the killing of his horse by the running of its train; and a motion for a new trial on the grounds indicated in the decision was denied. The horse was struck by the engine and killed on the 14th of February, 1889. A local stock law was in operation all over the county. The engine was pulling thirteen freight-cars and three passenger-coaches. On the engine and tender were air-brakes, and on the

coaches were hand-brakes.   According to the testimony
of the engineer, it was 15 minutes after 6 o'clock in the
evening when the horse was struck; it was dark enough
for the headlight of the locomotive to be burning, and it
was burning; it was such a headlight as is generally used
upon a train; this train was running between fifteen and
twenty miles an hour, which was about schedule time or
even lower than the speed allowed;.it was running down
grade—a very small incline; the track was straight for
about half a mile before reaching the place where the
horse was struck; it was raining and the track was wet,
rendering it more difficult for the brakes to hold the
wheels; at that place the engineer could not have stopped
the train under a quarter of a mile; the front window of
the engineer's cab was shut, and the beating of the rain
on the boiler tended to make fog settle on the window-
glass, so that he could not see out as well as on a clear
night; the fog also tended to blur the headlight; fre-
quently he had his head out of the side window, but not
at this time; when the headlight flashed upon the horse
standing on the track, the engineer saw it and called for
brakes, and blew two or three alarms before the engine
struck the horse; he threw his head out of the side-
window and saw it was a horse; could not tell what it
was before it was struck; was twenty or twenty-five
yards from it when he saw it; could not have stopped
the train under six or seven hundred feet; left nothing
undone that he could have done to stop it in a shorter
space; it was impossible to stop it before striking the
horse; there was no difficulty in the cars or the ma-
chinery which prevented stopping sooner; the fireman
was engaged in putting coal into the furnace; when the
whistle blew, the horse ran ahead about ten feet before
it was struck; it was standing when first seen; it was
struck near a stock-gap and thrown to one side, not
knocked across the gap; on a perfectly clear night the

headlight will show an object from 250 to 300 yards ahead; the window was closed to keep from exposure to cold and rain; when the fog on the glass gets too bad, it is wiped off; they cannot wipe it off every five seconds; the hand-brakes hold very nicely, but the air-brakes can be applied three times as quickly,—it is done in a second.

There was testimony for the plaintiff tending to show the following: He was passing through his field on the horse, going to the railroad. He came upon some pigs and started to drive them off. It began to get boggy, and he alighted, hitched the horse to a sapling and followed the pigs about a quarter of a mile. On returning he found the horse was gone, and took a near way home, expecting to find the horse there. Not finding it, he and another person went in search of it and found it at twelve o'clock that night dead on the railroad. It was standing right at the stock-gap when struck, and was knocked over the stock-gap. The road runs up grade where the train ran over the horse, fully five hundred yards. The night before it had rained, and that morning it rained a little; but that evening it faired off; it was fair when the horse was killed; the sun set fair that evening. The plaintiff was fully three quarters of a mile off when the train that ran over the horse passed; he could see the train when it ran along. He put up some fence before he went back to where he had left the horse; and when he got back there, it was not dark—between sunset and dark. When he heard the train passing, a man could have seen up or down the road as far as the road was straight; he had a quarter of a mile of straight railroad before he came to the horse. Fully half an hour after the train passed, the plaintiff saw his servant four or five hundred yards off, and gave him an order. The bridle-reins with which the horse was tied to the sapling were strong. The plaintiff did not find

them tied to the tree. This was four or five hundred yards from the railroad, and not more than a hundred yards from a private crossing over the railroad from the field to the plaintiff's house. There was no particular road leading home from where the horse had been left; further back there is a road; in the direction it was going there was no road at all. Plaintiff tracked it fully one hundred yards from where it got loose. It was not too dark to see the tracks. From the looks of them, the plaintiff decided it was going home, and turned off from the tracks and took a nearer way. It had gone pretty straight to the gap on the railroad; the gap was about six feet wide. The plaintiff heard no signal given by the train that evening. There was also testimony by the plaintiff (denied by the engineer) that just before the case was called for trial in the county court, the engineer said he wished they had got through with that case, that he wanted to go to Albany, that he did not know what they kept him there for, that he did not know anything about it until he was told about it the next day, knew they had struck something, but did not know whether it was a horse or something else.

R. F. Lyon and G. W. Warwick, for plaintiff in error.

C. B. Wooten and H. L. Long, by brief, *contra*.

Bleckley, Chief Justice.

1. The code, in section 3033, declares that a railroad company shall be liable for any damage done to stock or other property by the running of the locomotives or cars, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company. This rule of diligence was not modified or altered by subsequent legislation known as the stock law. *Central R. R.* v. *Hamilton*, 71 *Ga.* 461. With or without the stock law, the degree of diligence required of railroad companies is one and the same; it is "ordi-

nary and reasonable." What would amount to that degree of diligence in each particular case under all the circumstances, including the application or non-application of the stock law at the particular locality, and including also the scene of the occurrence, whether in an enclosed field or upon unenclosed lands outside, is a question for the jury. The jury can and should take into consideration all the pertinent and material facts, and in the light of the whole determine whether the care and diligence observed in the particular instance came up to the degree of ordinary and reasonable, or fell below it. The instructions requested and refused in this case sought to relieve the company, or to authorize the jury to relieve it, from as high a degree of care at the place of this occurrence as might be due from it at some other place. This is not allowable; for one and the same degree of care is due alike at all times and places; but what conduct will come up to that standard may not, and indeed would not, be alike at all places. To tell the jury that the degree of care and diligence might be varied, is a very different thing from instructing them that, while ordinary and reasonable care and diligence would be always required, the requirement might be met, if in their opinion it could be done under all the circumstances, by using less vigilance or watchfulness at one place than at another, always however keeping such lookout as would be reasonably necessary at the time and place in question to avoid coming in contact with animals that might happen to be at large and stray upon the track of the railway. Of course it would be reasonable for the lookout to be less strict according to the less probability of such accidents, and more strict where the probability was greater. While this perhaps may have been the distinction intended by counsel in submitting the request to charge, yet as the language used was susceptible of

another construction, the court was justified in declin-
ing the request and committed no error in so doing.
The principle of discrimination in adapting conduct to
conditions, while adhering to a single standard of dili-
gence, was recognized in *Central R. R.* v. *Ryles*, 84
*Ga.* 420.

2. It might have been more satisfactory to us if the
verdict had been the other way; but the evidence war-
ranted the finding and, the presiding judge being satis-
fied, we have neither the right nor the will to interfere.

*Judgment affirmed.*