32190.   AYCOCK *v.* CALLAWAY, trustee.

DECIDED DECEMBER 4, 1948.

*Maddox & Maddox*, for plaintiff.

*Matthews, Owens & Maddox, W. T. Maddox*, for defendant.

GARDNER, J. ▮ We think that the sustaining of this motion was reversible error for two reasons: First, the negligent killing of cattle under the stock law, generally known as the no-fence law, does not operate so that an animal on the right-of-way of a railroad, is a trespasser so that the railroad in the operation of its trains is not liable for damages unless it be guilty of wanton and wilful negligence. This stock law act did not change the law of liability with reference to the negligent liability for damage to cattle. The second reason is that the court had already ruled, on demurrer, that the stock law did not confine the acts of negligence to wilful and wanton negligence of the railroad company in killing cattle. The ruling on demurrer was the law of the case insofar as the trial court was concerned, since no exceptions pendente lite were filed thereon. Of course, we realize that during the trial the court could have withdrawn its decision on the demurrer. This was not done. So the ruling on the demurrer and the direction of the verdict on the ground that the evidence did not show wilful and wanton negligence are inconsistent. This brings us, then, to the next question as to whether the evidence demanded a verdict that the defendant railroad was not guilty of ordinary negligence as a matter of law. We think that the court was correct in overruling the demurrer that the petition did not allege acts sufficient to show wilful and wanton negligence. The Supreme Court in *Central of Ga. R. Co.* v. *Summerford*, 87 *Ga.* 626, 629 (13 S. E. 588), in a decision rendered by Judge Bleckley, said: "The Code, in section 3033, declares that a railroad company shall be liable for any damage done to stock or other property by the running of the locomotives or cars, unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company. This rule of diligence was not modified or altered by subsequent legislation known as the stock law. *Central R.* v. *Hamilton*, 71 *Ga.* 461. With or without the stock law, the degree of diligence required of railroad companies is one and the same; it is 'ordi-

nary and reasonable.' What would amount to that degree of diligence in each particular case under all the circumstances, including the application or non-application of the stock law at the particular locality, and including also the scene of the occurrence, whether in an enclosed field or upon unenclosed lands outside, is a question for the jury." This court held in *Atlanta & West Point R. Co.* v. *Hudson,* 2 *Ga. App.* 352 (4) (58 S. E. 500), as follows: "The rule of diligence required of railroads in running cars to prevent killing stock is not modified or altered by the legislation known as the stock law; and it is not, as a matter of law, contributory negligence to allow stock to run at large in communities where such stock or fence law prevails." And the court, on page 355, amplified this ruling, and commented: "Error is assigned on the failure of the court to charge the jury upon the issue of contributory negligence. It is claimed that what is known as the stock law existed in the community where the cows were killed, and that the fact that the owner of the cows allowed them to roam at large where such law prevailed, furnished evidence of contributory negligence. The existence of the stock law may be a pertinent fact to be considered by the jury along with other facts and circumstances in determining the question of the exercise of ordinary and reasonable care and diligence in guarding against killing stock by the running of trains. The existence of the stock law is not necessarily evidence of contributory negligence, nor is the rule of diligence imposed by law upon railroads to prevent the killing of stock altered or modified by such local legislation. 'With or without the stock law, the degree of diligence required of railroad companies is one and the same. It is ordinary and reasonable care.' " We do not overlook the decision in *McKenzie* v. *Powell,* 68 *Ga. App.* 285 (22 S. E. 2d, 735), which perhaps caused the court to erroneously direct a verdict. While this court said in that case that the animals were, in effect, under the facts of that case, trespassers for having, in a no-fence county, gone upon the right-of-way and eaten poisonous chemicals used by the railroad company for killing vegetation on its right-of-way, and which poison the owner of the cattle knew had been used by the railroad company—the court stated: "Recovery is sought because of a *dangerous statical condition of the premises* and not because *dangerous active operations were*

*being·carried on* (active negligence)." (Italics ours.) In reading that case under its facts in the light of *Central of Ga. R. Co.* v. *Summerford,* supra, and *Atlanta & West Point R. Co.* v. *Hudson,* supra, under their facts, the facts in *McKenzie* v. *Powell,* supra, are readily distinguishable. The former two cases, as here, are dealing with dangerous operations, active negligence. The *McKenzie* case deals with statical negligence. That is quite a distinction. As Judge Bleckley stated in *Central of Ga. R. Co.* v. *Summerford,* supra: "What would amount to that degree of diligence in each particular case under all the circumstances, including the application or non-application of the stock law at the particular locality, and including also the scene of the occurrence, whether in an enclosed field or upon unenclosed lands outside, is a question for the jury." So also in the instant case. And this court in *Atlanta &. West Point R. Co.* v. *Hudson,* said: "The existence of the stock law may be a pertinent fact to be considered *by the jury along with other facts and circumstances in determining the question of the exercise of ordinary and reasonable care and diligence in guarding against killing stock by the running of trains.*" (Italics ours.) So likewise in the instant case, under the active negligence acts alleged in the petition, it is a jury question as to whether the defendant was in the exercise of ordinary care and diligence, and not a question of whether the defendant was guilty of wanton and wilful negligence. The evidence shows that the pasture of the plaintiff was enclosed by an electrified wire fence which some intruder had cut. This circumstance, along with all others, should have been submitted to the jury for their determination and should not have been decided as a matter of law by the court. Of course this statement is made on the proviso that the evidence as to the lack of negligence of the defendant demanded a verdict for it as a matter of law. This, then, brings us to inquire as to whether the failure to prove actionable negligence against the defendant demanded a verdict in its favor as a matter of law. Let us look at the record as to this.

There was no eyewitness to the killing of the cattle except the engineer operating the train, and the fireman. There was, however, considerable evidence concerning the place and the circumstances where the cattle were killed, including the terrain

of the track, the visibility in front of the train, the position of the cows, the visibility of the carcasses of the cows after they were killed and, in connection therewith, the testimony of the engineer and the fireman. We will quote a portion of the testimony of the engineer. The cattle farm was located at what was generally known as Berry Hill, just outside the City of Rome. The engineer testified: "I remember the occasion about May 30th or 31st of last year, when some cows, alleged to belong to Mr. Aycock, were killed up near Berry Hill crossing. I was operating the train going north that day. It was about 3:30 in the afternoon when I approached Berry Hill crossing at this place going north; that was about what time it was when I went through Morrison; that is, Morrison siding, which is about a mile and a half this side of Berry Hill crossing. As I approached Berry Hill, as to how fast I was operating the train and what happened; well, we left here just a little after three, *we got behind a passenger train, and another train was right behind me,* he was in East Rome when I left there, and after I passed Morrison, going around this curve to the left which is nearly, I guess it is a half a mile the other side of Morrison, but the curve is a good long curve, a long sweeping curve down there, and I didn't know anything had happened, but just before we got there, we went in the curve, and I saw an old poor cow over in the weeds just outside the fence, a fence along the right-of-way there, it was just one strand of wire, I noticed this old dairy type of cow, just standing around over there, and I said, 'I don't know, old gal, you are on the wrong side of that wire,' and we went a couple hundred yards, I guess, further around the curve there, and I saw a white-face calf coming in there, I looked at it and I thought it was one of these, they had been having some white-face cattle in the pasture, and I looked over there at the fireman, and I said, 'Do you see anything?' And he said: 'There is one coming out on my side.' Well, I said, 'One came out on my side.' After this conversation, I looked back and I saw we was knocking up dirt from under the train, from which I knew we was dragging one, and this train being so close behind me, *I didn't stop, that would have throwed the cab just around the curve there, and it would have just been a death trap for this train that was following me, the flagman would have to have*

*time to get back; where I was going to stop at, the flagman would have a chance to get back on the straight,* but before I got stopped, it fell in the clear and I knocked the brakes off and went on. I did not see those cows before I hit them; *well, around this curve to the left, it was impossible for a man to see the track.* I went on to Chattanooga. I had another train coming south that night. I came back about 11 o'clock. As to whether or not anything happened there at practically this same place on my southbound trip, well, back between there and Morrison that night about 11 o'clock I was rounding the curve and got on down toward Morrison a good little ways, I saw a cow out walking the track on my side, and she raised her head up and I saw it was another white-face cattle, she raised her head up and started toward the track, and I commenced blowing the cattle alarm and she was pretty close and I couldn't stop, and it went on across, and just as she went across I hit her, knocked her off on the left side of the train. I was about a couple hundred feet from that cow when she went on the track. As to what distance I could have stopped that train that night, well, a freight train, 30 miles an hour, about 400 feet. I said that I blew my whistle; I blew the cattle alarm when I saw the cow." There was other evidence regarding the distance of visibility of the track in front of the train, to the effect that, if the engineer and the fireman who were in charge of operating the train had been on the lookout, they could have seen the cattle in sufficient time to have stopped the train before hitting them, if they had been operating the train carefully. It will be observed from the evidence above quoted that, even after the engineer had hit one of the cows as he was going north at 3:30 in the afternoon, he was afraid to stop because he would have created a death trap for the train immediately behind him. The jury might have inferred, from all the circumstances of this case, that he did not stop when he saw the cows, for fear he would create such a death trap; for they could have inferred that the death trap would have been created in a much more dangerous place had he stopped his train before he struck the cattle. We think that all of these matters were for the jury to determine and not for the court. Certainly the plaintiff should not be held to account for the defendant operating its trains in such

close proximity to each other that it could not stop the first train regardless of death to animals and perhaps to persons.

In view of the whole record of this case, the court erred in directing a verdict. The judgment is therefore reversed.

*Judgment reversed. MacIntyre, P.J., and Townsend, J., concur.*