SOUTHERN RY. CO. v. HOPKINS.

(Circuit Court of Appeals, Fifth Circuit.   April 29, 1908.)

No. 1,665.

1. TRIAL—TAKING QUESTION FROM JURY—SUFFICIENCY OF EVIDENCE.

Where there is any positive evidence tending to establish a material fact in issue, the court is not justified in withdrawing such issue from the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, § 338.]

2. MASTER AND SERVANT—INJURY TO SERVANT—RULES OF RAILROAD COMPANY.

Where, in an action against a railroad company to recover for the death of an employé, alleged to have resulted from a defect in the car upon which he was riding, the defendant relies upon its printed rules as imposing the duty of inspection upon the deceased under the circumstances, such rules must be strictly construed against the company when their language leaves the matter in doubt.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 288.]

3. SAME—DEFECTIVE CARS—CONTRIBUTORY NEGLIGENCE.

A custom of a railroad company, known to its employés, to inspect cars only in its yards, will not relieve it from liability for an injury to a conductor in its employ caused by a defect in a car which he was sent at night to bring to the yards from a manufacturing plant, unless the defect was so obvious that the failure of the conductor to observe it constituted contributory negligence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 710–722.]

4. TRIAL—INSTRUCTIONS—CHARGING UPON QUESTIONS OF FACT.

In an action against a railroad company to recover for the death of a conductor alleged to have resulted from a defect in a car from which he undertook to dismount while it was moving, an instruction that, in the absence of any proof to the contrary it would be presumed that he attempted to dismount for some reason essential to the performance of his duty, was erroneous as invading the province of the jury; the question of contributory negligence being one of fact for their determination.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 420–435.]

Shelby, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of Georgia.

Jos. B. Cumming and Bryan Cumming, for plaintiff in error.

C. Henry Cohen and Archibald Blackshear, for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and BURNS, District Judge.

BURNS, District Judge. This suit, commenced in a state court, was removed by defendant to the Circuit Court of the United States for the Southern District of Georgia. The object of the action was for damages for personal injuries to plaintiff's husband, resulting in death, whilst engaged as a conductor in the yards of the defendant at Augusta. The pleadings of plaintiff allege that the deceased came to his death in the yards of the company at night while attempting to dismount from a moving car; that defendant was guilty of negligence, in this: The car upon which deceased was sitting was defective by reason of a plank slightly elevated (about one-half inch) above the flooring and a nail which projected from the end thereof; that the pants of deceased caught upon the end of said plank and upon said nail, causing deceased to lose his balance and to be thrown in front of the car, one wheel of which passed over his body, resulting in instant death. The defendant denied each material allegation, and contended that the deceased was negligent in attempting to dismount while the car was in motion; that the same was a violation of the rules established by the company, and, further, that it was the duty of the deceased to inspect the car and discover the defects, if any; that failure so to do was negligence. The plaintiff obtained a verdict and judgment for $7,500, and the defendant assigns the following errors:

First. The refusal of the trial court to direct a verdict for the defendant. It is frequently said that the servant must establish three propositions to entitle him to recover from the master for any injury received in the master's business: (1) That the appliance is defective; (2) that the master has notice thereof, or knowledge, or ought to have had; (3) that the servant did not know of the defect, and had not equal means of knowing with the master (Wood on M. & S. § 414). In the event the danger (in this case the defect) was as obvious and apparent to the employé as the master, he is not entitled to recover. The evidence discloses that the deceased was directed to go to an industrial plant, known as the Buckeye Cotton Oil Company, connected by spur track with line of defendant, and bring in certain cars. This order was given between 4 and 5 o'clock the evening of the accident. The evidence fails to show at what time this order was executed, but it does appear that the accident occurred at about 7:35 p. m. upon the conductor's return to what is known as the "Fenwick street yard." The car upon which the conductor was seated was in front of the engine, said car being an oil car containing a tank filled with oil at said plant. The city ordinances of Augusta limit the speed of the trains to five miles per hour, and a flagman was preceding the train by walking ahead so as to signal in the event of danger to any person about to cross the track. The train consisted of engine and three cars, two in

the rear of the engine and one in front, upon the northeast corner of which the conductor was seated. Said train was moving east along Washington street, and, when about opposite Fenwick street, the conductor attempted to dismount, and, in the language of John Jones, the only witness offered upon the trial who claims to have witnessed the accident:

"At the time Capt. Hopkins was killed, I was standing between Fenwick and Washington streets. He was sitting on the right-hand side, right at the end of the train. It was going at the rate of 1½ to 2 miles an hour. I saw him take his lantern and put it on his arm. He put his hand down and got up, swung, hung, and fell over. He hung by a nail which hung on his pants. I saw what occurred from where I was standing. It was night. I was the length of this room away from him. I saw his trousers catch on the nail. After he fell, I went up there, but did not see the nail. I would consider it about 30 yards across this courtroom; that is about the distance I was away from Mr. Hopkins. I could see his pants hung. There was nothing else for him to be hung on. The nail stuck out from the right side of the car, right at its top. There was an electric arc light on the other side of him. The car had not quite reached the electric light."

Blount, chief inspector, and his assistant, Hood, were called a few minutes after the accident, and reached the scene before the car had been moved. They detail the character of inspection made, and both testify that they carefully examined the plank and end of the car upon which deceased was sitting, and from which he fell, and there was no defect and no nail. Blackston, at that time yard foreman, and still in the service of the company, stated upon direct examination that he examined the car and found the nail. Upon cross-examination he admitted that he examined the car shortly after the accident with a lantern and failed to discover any nail, but that he examined the car again the next day in the Hamburg yards, across the Savannah river, and found the nail. The car was photographed about 20 days after the accident. The witness Blackston testified that the car had undergone no change since his examination. Three photographs accompany the record, showing the car, and particularly the northeast corner thereof, and by the use of a magnifying glass the nail may be observed in one of the pictures, but it is not discoverable in the others. The testimony of the inspectors is to the effect that the nail would be regarded as a defect or obstruction. The only other evidence tending to support the nail theory is that the pants disclosed a rent in the rear, reaching nearly to the waist band, but the evidence shows that the body of the deceased was dragged by the brake beam, and this may as readily account for the rent as the protruding nail. The fact that the nail was present the day after the accident is not material, and but a slight circumstance to indicate its presence at the time of the accident. The witness Blackston is perhaps not too zealous in aiding the administration of the justice of the case, but the suggestion occurs that, in the event a witness could plainly see the nail when only the head of it was exposed to his vision a distance of "thirty yards," this witness who was making examination for the sole purpose of locating the defect ought to have made the discovery of that which was so patent to the main witness. The result is one witness, Jones, claims to have seen the nail whilst standing across the street. Blackston, the yard

foreman, examined the car with his lantern and failed to find it. Two witnesses, Blount and Hood, looking for the defect in the board upon which deceased was sitting, positively declare there was no nail. We are of the opinion that the preponderance of the testimony establishes the absence of the nail at the time of the accident, but under the holding obtaining here and elsewhere the trial court would not be justified in withdrawing the case from the jury, though it is difficult to appreciate, under the facts of this case, that the burden of proof resting upon the plaintiff to establish the defect has been fully discharged. Matters of this kind in most jurisdictions are committed to the sound discretion of the trial court in determining whether or not the verdict shall stand as the judgment of that court, and, where there is any positive evidence tending to establish a material fact, we are not at liberty to sustain an assignment based upon the refusal to direct a verdict for the defendant.

The next contention of the defendant is that the verdict should have been directed for the defendant by reason of the fact that under the rules and custom obtaining with this company, and well known to the deceased, it was his duty to make the inspection of the car at the mill of the cotton oil company, and that his failure constitutes negligence, and upon the further ground that the deceased, well knew that the custom had long obtained upon the part of the company not to inspect any cars at industrial plants, and, by reason of this custom and the failure upon his part to make the inspection, he was guilty of negligence and not entitled to recover. In answer to the suggestion as to the printed rules of the company, as offered in evidence, a copy of which had been furnished the deceased (his receipt therefor being introduced by defendant), it is difficult to say that the rule relied upon places the duty of inspection, at such places, upon the conductor. Evidence was introduced to the effect that the rule in question only charged conductors with the duty of inspection while operating trains upon the road, and courts will not give a larger intendment to the rule than the language thereof clearly permits; the rationale being to limit, and not to extend, such instruments. The construction should be strict, rather than latitudinous. Upon the proposition that the custom long obtaining and well known to the deceased, that this defendant only made inspection of cars in its yards, and not elsewhere, operated to preclude the deceased from relying upon inspection at any other place or point, it is deemed sufficient to say that, in the absence of a rule plainly governing a like situation, the deceased was not called upon to perform a duty resting upon the master to see that the car was in a reasonably safe condition. This is a legal requirement upon the part of the master which he cannot escape, and it follows as a matter of law that the train employé will not be denied a recovery for failing to detect a dangerous defect in a car, unless it be such danger or defect, as is patent and obvious. We cannot, therefore, consent to the adoption of the view that the verdict should have been directed for the defendant upon the ground that the facts of this case make an exception to the general rule. It does not conclusively appear that the defect was so patent and open to observation as to preclude plaintiff's right

to submit the question to the jury. For the reasons stated, the assignment is not sustained.

In this connection it may not be improper to observe, however, that the charge of the court submits to the jury the question of negligence upon the part of the defendant in permitting the raised board to remain upon the car. This is not assigned as error, but clearly the case should not have gone to the jury on this issue for the reason that this was a foreign car, and while the duty is the same in regard to inspection as if it were a domestic car—that is, the property of the compa----—the plank in question was an integral part thereof, and, if defect ↓ the law would charge a knowledge thereof to the man who sat upon it from the time the car was placed in motion until he went to his death. Besides the whole testimony as to the cause of the accident, that of the witness Jones affirmatively discloses that the plank had no connection with the injury. To charge upon an issue not supported by evidence is uniformly condemned, and under the facts of this case, if assigned, would operate as a reversal.

The next assignment complains of that part of the charge which instructs the jury that:

"In the absence, however, of any proof to the contrary, it will be presumed that he [the conductor] attempted to dismount from the car for some reason essential to the performance of his duty."

We are of the opinion that the charge is erroneous, in that it invades the province of the jury. The only question for the jury to determine bearing upon the act of the conductor in attempting to dismount from a moving train is whether or not he was guilty of negligence which contributed to the accident. The jury may have readily understood that, if the act itself was induced by a desire and necessity to perform a service due the master, the act and effort to serve the master would not be negligent. The holding is uniform that questions of fact are for the jury, and that a charge which assumes to determine a material fact is an invasion of the province of the jury. This proposition is supported by the following authorities: Railway Co. v. Jones, 130 Ala. 456, 30 South. 586; Railway Co. v. George, 94 Ala. 199, 10 South. 145; Carroll v. Railway Co., 82 Ga. 452, 10 S. E. 163, 6 L. R. A. 214; Railway Co. v. Roach, 64 Ga. 635; Railway Co. v. Wangelin, 152 Ill. 138, 38 N. E. 760; Railway Co. v. Warner, 123 Ill. 38, 14 N. E. 206; Railway Co. v. Morgan, 132 Ind. 430, 31 N. E. 661, 32 N. E. 85; Dolphin v. Plumley, 175 Mass. 304, 56 N. E. 281; Avilla v. Nash, 117 Mass. 318; McGrath v. Railway, 76 Minn. 146, 78 N. W. 972; Bluedorn v. Railway, 121 Mo. 258, 25 S. W. 943; Marcus v. Loane, 133 N. C. 54, 45 S. E. 354; Bodie v. Railway, 66 S. C. 302, 44 S. E. 943; Railway v. Smith (Tex. Civ. App.) 82 S. W. 787; Railway v. Burns (Tex. Civ. App.) 63 S. W. 1035; Railway v Waller (Tex. Civ. App.) 62 S. W. 554; Railway v. Baker (Tex. Civ. App.) 58 S. W. 964; Railway v. Smith (Tex. Civ. App.) 51 S. W. 506; Railway v. Zapp (Tex. Civ. App.) 49 S. W. 673; Railway v. Gaither (Tex. Civ. App.) 35 S. W. 179; McKelvey v. Railway, 35 W. Va. 500, 14 S. E. 261; Railway v. Camp, 105 Fed. 212, 44 C. C. A. 451; Railway v. McClintock, 91 Fed. 223, 33 C. C. A. 466.

Having reached a disposition of the case, it is not deemed essential that the two remaining assignments should be discussed. By reason of giving the charge complained of, the judgment of the Circuit Court should be reversed, and the cause remanded with instructions to grant a new trial; and it is so ordered.

SHELBY, Circuit Judge (dissenting). I am constrained to dissent from the opinion just read. A short excerpt from the elaborate and well-considered charge of the trial judge is selected on which to base the judgment of reversal. Construing the language decided to be erroneous with the evidence and the context of the charge, I am of opinion that it does not constitute such error as makes it proper to reverse the judgment.

The cars were moving very slowly, at the rate of 1½ or 2 miles an hour, when the deceased got off. It was proved to be the custom of the conductors to get off the trains when running even faster than the one in question. This custom was known to the officers of the railway company. It was shown that no conductor could have kept his place who waited till the train came to a standstill before he would get off. As to the circumstances under which the deceased attempted to alight when he was killed, a witness testified:

"It was a matter of his duty to get off, because his time had run out. That was his terminal, and he was to be relieved by his night relief. He was supposed to be relieved about 7:30, and this happened about 7:35. The car had almost come to a stop as to where they would back into the Fenwick street yards, still moving toward the yard. It would have to be backed in. The engine was in the middle of two cars—one in front and one behind. It would have been his duty for him to have gotten off and selected his track to back his train in. He was supposed to be relieved there by his night relief. Whether he got off for his relief or to back his train in I am unable to say. They relieve each other sometimes when the train never stops, and they proceed right on to destination as possibly a man might be going to Hamburg. He would climb up on his train and take his papers, and proceed on to Hamburg without the train ever stopping. I don't know of my own knowledge why he got down. The track he was on was running north. You have to pass beyond Fenwick street to the north, and you would then back into the yard on Washington street. It branches off into the Fenwick street yard; that is located between Fenwick and Washington streets. Where he fell from the car is right opposite to the Washington street yard. I found the relieving crew there. He had not been moved. It was about 15 minutes after the accident."

As bearing on this question, the judge charged the jury as follows:

"When a point on the track was reached opposite the freight office of the company, where, according to the testimony of one of the witnesses, it was necessary to stop the car and back into the yard, while the train was slowly moving, Hopkins attempted to get off the car. Whether he did this to surrender the train to a new crew which was waiting for him there, or whether to take his position on the other end of the train, which was now backing into the yards of the company, or whether to walk back and select a track in the yard on which his train was to be placed, is not made clear by the evidence. *In the absence, however, of any proof to the contrary, it will be presumed that he attempted to dismount from the car for some reason essential to the performance of his duty.* A witness who was standing a short distance away testified that, as Hopkins proceeded to get down from the car, he, the witness, saw his trousers catch by a nail, that he swung under the car forward of the front wheel, which passed over him, crushing him to death. This witness, a negro named John Jones, testified that there was a large electric light there, and that, although it was night, he saw the occurrence plainly."

I have designated by italics that part of the charge which the court has found to be reversible error. If it be assumed that the judge was in error in stating what the presumption would be in the absence of proof, it would be a perfectly harmless error, because the proof shows that the car had arrived at a place where it was the duty of the deceased to alight, and that it was going at a speed when, in the absence of the defect in the car complained of, the deceased could have left the car in safety.

I do not think the sentence of the charge quoted in the opinion is error justifying the reversal of the judgment.

NOTE.—The following is the charge to the jury by SPEER, District Judge in the Circuit Court:

"The controversy on trial presents for your consideration and determination two issues of fact. The first is: Was the defendant company guilty of negligence resulting in the death of W. L. Hopkins, as charged? The second is: Did W. L. Hopkins, an employé of the company, by any negligence on his part contribute to the casualty which occasioned this result? The burden of proof is on the plaintiff to show to your moral and reasonable satisfaction that the charges of negligence, or a charge of negligence, set forth in the declaration are true. The proof must preponderate in the plaintiff's favor to show this fact in order to support her claim. In case you find from the evidence that the plaintiff was negligent in view of the defense that plaintiff's husband was an employé of the company and contributed by his own negligence to cause his death, the burden of proof will be on the defendant company to show this latter contention, and the evidence relating thereto must preponderate in its favor on that issue before you would be justified in holding the contention to be true.

"It appears from the pleadings, and to a degree from the evidence, that on the 27th day of October, 1904, W. L. Hopkins was a yard conductor of the Southern Railway at Augusta, Ga. His duties as such were to conduct cars or trains of cars to and from connecting lines in the city of Augusta, and to superintend such general switching as might be incident thereto. On the date mentioned in the declaration he was ordered to proceed to the Buckeye Cotton Oil Company to do some necessary switching, and to bring back to the yard of the defendant in the city a certain tank car of the firm of Proctor & Gamble. It appears that he made up his train at the Buckeye Cotton Oil Mills. The engine was in the middle pushing a tank car and pulling a freight car. It is not in fair dispute that the conductor's place while in charge of a train going over the railroad tracks within the corporate limits of Augusta was some point on his cars where he could see both the locomotive engineer and the flagman, who was compelled to precede the train for the purpose of preventing injury to people crossing the tracks. The trains on the tracks traversing the streets of the city are required to go at a very low rate of speed, not to exceed five (stated by defendant's counsel answering question of court) miles an hour. The engineer of the locomotive moving the train in question was, as usual, on the right-hand side of the locomotive. The large oil tank on the car in front of the engine on which Hopkins was precluded him from keeping in view the flagman walking in front, and the engineer behind him, unless he also should occupy a position on the right of the tank car. He might possibly have seen both from a point on that car nearer the engine, but the testimony was positive, and not contradicted, that in view of the course that the train was pursuing, a proper position for him was on the northeast corner of the front car. He was sitting immediately above the right-hand end of the front transverse beam. When a point on the track was reached opposite the freight office of the company, where, according to the testimony of one of the witnesses it was necessary to stop the car and back into the yard, while the train was slowly moving, Hopkins attempted to get off the car. Whether he did this to surrender the train to a new crew which was waiting for him there, or whether to take his position on the other end

of the train, which was now backing into the yards of the company, or whether to walk back and select a track in the yard on which his train was to be placed, is not made clear by the evidence. In the absence, however, of any proof to the contrary, it will be presumed that he attempted to dismount from the car for some reason essential to the performance of his duty. A witness who was standing a short distance away testified that, as Hopkins proceeded to get down from the car, he, the witness, saw his trousers catch by a nail, that he swung under the car forward of the front wheel, which passed over him, crushing him to death. This witness, a negro named John Jones, testified that there was a large electric light there, and that, although it was night, he saw the occurrence plainly. The defendant put in the evidence the report of the accident, date October 27, 1904, time 7:32 p. m., but probably written shortly thereafter. It was signed by H. F. Blackston, who was the yardmaster of the Southern Railway. This witness was on the scene a short time after Hopkins was killed. This report was required by the company. In reply to the question, 'State fully how it occurred?' he answered, 'While riding on front end of tank car, it is supposed that, when he went to get off, floor of car caught his trousers, and threw him on rails.' This is reiterated and slightly elaborated in the remarks appended to that report as follows: 'While coming from Buckeye Cotton Oil Mill with one car ahead and two cars behind engine, Conductor Hopkins, who was riding on front of the head car, which was a tank car, sitting on floor of car, it is supposed that, when he attempted to get off the moving car, some of his clothing caught on car and threw him across rails. One wheel passed over his body, killing him at once.' From the same report it appears that the engineer of this train was W. T. Burckhalter, the fireman was James Way, the front brakeman Joe Addison, the brakeman Benjamin Weston. None of those witnesses were produced or sworn. In response to the question, 'Name and address of all eyewitnesses of the injury, employés and others,' the name John Jones, colored, Augusta, Ga., is given in the same report. Blackston, then yardmaster, is now the yardmaster of the defendant company at Columbia, S. C. He was produced as a witness for the plaintiff. He says that he saw the car that night, and the next day in his report, which he says he did not write—it was typewritten—but which he signed, in answer to the question, 'If defective, number and initials of car or engine,' the word 'None' is written. Blackston, however, testified that he did not see the nail in the end of the beam that night, but he did see it the next day. He also described the condition of the floor of the car where Hopkins was sitting. This was likewise made plain by the photographs which the defendant company had taken, and which the plaintiff introduced. This makes it obvious that the front of the car on which Hopkins was sitting had been noticeably worn or damaged. You will have the photographs before you, and can determine to what extent this had been done. First on the floor of the car in the direction in which it was proceeding was a new plank. This appears intact. It is noticeably higher than the worn and battered plank which is behind it. This the witnesses testify and this also appears as will be seen from the photographs. Blackston testified that the nail projected at a point beneath that on which Hopkins was sitting from a quarter to three-eighths of an inch. It was 10 or 20 penny nail he said. Two car inspectors testified, one for the plaintiff and one for the defendant, that such nails when found by the inspectors were regarded as dangerous to the train hands, and were driven in. There is no contradiction as to these statements that such projecting nails on the cars were dangerous to the safety of the men who worked on the trains. The trousers worn by the unfortunate conductor were introduced in evidence. There was a long rent in the seat, extending toward the waist band, which it is insisted for the plaintiff was occasioned by the nail, which it is alleged caught in the cloth as the conductor attempted to jump or slide off the train. There is no contradiction in evidence whatever as to the manner in which Hopkins came to his death, except that afforded by the testimony of two inspectors for the company, who examined the car that night and the next day, and testified that there was no nail there. There was also evidence to the effect that the new plank, projecting above the battered plank behind it, was dangerous to safety. It is true, however, that Blount, inspector for the company, testified that he carefully examined this

161 F.—18

car, and that it would not have been condemned. The evidence is in conflict upon this subject. If the trousers hung either from the protruding nail, or from the irregularity or uplift in the floor caused by the new plank, and if the jury find that Hopkins' body was for a moment suspended in the air as testified, and because of such suspension he lost his balance and the control of his person, and because of his inability to extricate himself was thrown either feet foremost or head foremost across the track and under the car, then the presence of the nail or the irregularity which caught his trousers may be by them regarded as the cause of his death. If the jury find from the evidence that neither of these alleged grounds of negligence was the cause of the death of the plaintiff's husband, there is an end of the case, and the verdict must be for the defendant. If you are satisfied, however, that the evidence preponderates in favor of the plaintiff on either of these issues, your next inquiry will be: Did the particular object, which it is contended caused Hopkins to fall under the forward overhand of the platform car and in front of the first wheel, constitute such a defect in the condition of the car as will support the charge of negligence?

"Now the determination of negligence is entirely a question for the jury. It is presumed by the law to be a matter of that character which 12 practical men can, better than the court, determine in accordance with the truth and the principles of right and justice. You have heard the evidence on that subject, and the question of negligence is submitted exclusively for your consideration. I may add that all I have said with regard to the evidence is submitted, as I have the right to do under the practice of these courts in summing up, merely to assist, and not to control, you. Our practice is quite different from that of the state courts, where the evidence may not be discussed. In these courts, adopting the old common-law practice, the judges have the power to refresh the minds of the jury as to the salient features of the evidence, to arrange it, and collocate it so as to assist them, but the final duty with regard to finding the facts is exclusively for the jury. All I have done, or may do, has been done merely for the purpose of assisting you, and not for the purpose of controlling your independent judgment, which must determine the issues of fact in this case.

"There are, however, certain principles of law which you must consider as aiding you in the determination of this question of negligence. Perhaps the rule upon this subject cannot be better expressed than in the language of the Supreme Court of Massachusetts, cited with approval by the Supreme Court of the United States. It is as follows: 'The rule of law which exempted the master from responsibility to the servant for injuries received from the ordinary risks of his employment including the negligence of his fellow servants does not excuse the exercise of ordinary care in supplying and maintaining proper instrumentalities for the performance of the work required. One who enters the employment of another has a right to count on this duty, and is not required to assume the risks of the master's negligence in this respect.' In this case you will understand that the defendant company occupies the attitude of the master. 'The fact that it is a duty which must always be discharged, when the employer is a corporation, by officers and agents, does not relieve the corporation from that obligation. The agents who are charged with the duty of supplying safe machinery are not, in the true sense of the rule relied on, to be regarded as fellow servants of those who are engaged in operating it. They are charged with the master's duty to his servant. They are employed in distinct and independent departments of service, and there is no difficulty in distinguishing them even when the same person renders service by turns in each, as the convenience of the employer may require.' In a subsequent portion of the same opinion, the court said: 'The corporation is equally chargeable, whether the negligence was in originally failing to provide, or in afterwards failing to keep its machinery in safe condition.'

"In the light of this decision the tank car or flat car, as it is indifferently called during the progress of the trial, may be regarded as machinery. The obligation of the railway company to furnish and to keep it in safe condition is indisputable. It follows that if a conductor, or other employé whose duty is not to furnish but to operate machinery, should be injured by defects, for the absence of which the company can properly, in view of all the facts,

be held culpable, the latter would be liable for injuries which may result. I am speaking generally now of such freight cars, and not of this particular freight car. The application to this freight car will be subsequently made. The duty of keeping the cars passing over its lines in safe condition implies the duty on the part of the company of inspecting them. This does not require an unreasonable inspection, but it should be made with ordinary care and diligence. A railroad employé, of course, pursues a dangerous and hazardous occupation. In a sense he may be said to take his life in his own hands when he engages to work with ponderous trains and machinery and cars, moving with different degrees of rapidity, and if this—or any other accident—however lamentable the result, was brought about by the ordinary risks or dangers of that service, there ought to be, and can properly be, no recovery against the defendant company. But at the same time, if, for want of proper inspection, there was a dangerous defect left in the car, and an ordinary or proper movement was made by Hopkins in the performance of his duty without negligence on his part—which otherwise would have resulted in no injury whatever—and these became the proximate cause of his death, the jury may, if they think proper, regard the presence of such defect as negligence. But, as I say, the question of negligence is entirely for them.

"Nor does it matter if the defect is in the cars of another railroad company, or other person, firm, or corporation, operated·on the lines of the company where the injury was sustained. It does not matter to an employé whether he is hurt by a defect in the car of the company employing him or the car of another company. The injury to him, or his family, is the same. It follows that a railway company is responsible for such defects as would be disclosed by ordinary inspection; that is, by ordinary care and diligence. When cars come to it which have defects, visible or discoverable by such inspection, it must either remedy such defects or refuse to take such cars. This much is due to its employés. Whether there was such a defect in the car which killed the plaintiff's husband, and, if there was, whether it could have been disclosed and discovered by ordinary care and diligence in inspection, and whether because of this defect he was actually killed, are questions for the jury.

"At the request of defendant's counsel, I charge you that 'in a case of this character the plaintiff cannot recover, unless her husband could have recovered in the event he had merely received personal injuries instead of having met with his death.' Also at the same request: 'If the deceased immediately or remotely, directly or indirectly, caused the injury or any part of it, or contributed to it at all, his wife could not recover.' 'His wife' by which the counsel means the widow, could not recover. I also give you the additional instruction asked by the defendant's counsel: 'Before an employé can recover from a railroad company, he must be free from fault, and, if he is killed while in disobedience of a rule of the company, his widow cannot recover, unless it appear that such disobedience did not directly or indirectly contribute to any degree to the injury.' To this general principle I feel obliged, however, to add that if it shall satisfactorily appear to the jury by a preponderance of the evidence that the very exigencies of the business of the company, and the requirements of the defendant company's officers, obliged defendant's employés to disregard the written or printed rule, and if this was universally known to be true, and if such violation was constantly made, and the evidence discloses no attempt on the part of the company to stop it, other than the rule, the printed or written rule prohibiting such action cannot be regarded as relieving the company from the results of alert and active conduct on the part of its employés, which was necessary and proper, and of which it continually enjoyed the benefit.

"The next request to charge by the defendant's counsel is cognate, and is also given. 'When an employé of a railroad company has his choice of two ways in which to perform a duty, the one safe and the other dangerous, though convenient, he is bound to select the safe method, and, if he does not and is killed, cannot recover.' This rule, while correct as a general principle, in view of the issues here involved requires brief elaboration. If it is clear from the evidence that the business of the defendant company required that the more dangerous way should be adopted, that the movement of passengers

and freight in modern intercommunication and commerce required constant activity and alertness on the part of its own employés and swift movement and swift dismounting from cars when they were not proceeding at an unreasonable rate of speed, and beyond a rate of speed permitted by the law, and if the rule of the company either expressly or impliedly required such alertness and activity of its employés, even though a method may be more dangerous than slower and more cautious methods, it is true that a company cannot be exonerated from the consequences of such alertness and activity as it actually demands from its employés, although it may be apparently obnoxious to its written or printed rules, published some time before.

"At the request of the defendant's counsel, I charge you that 'a corporation acts only through its agents. A corporation's inspection of cars is necessarily done through its agents. It may, if it sees proper, delegate that duty to inspect to one set of employés under certain circumstances, and to another employé or set of employés under other circumstances. If the employé to whom the duty of inspection is delegated under certain circumstances fails in that duty, it is his own negligence and there can be no recovery by his widow if he is killed as a result of his own failure in the matter of inspection.' This is a correct statement of the general rule. It should always have a reasonable construction in view of the facts. It will be for the jury to determine if the failure of Hopkins to discover the defects in the cars, if there were any such defects, contributed in any degree to cause his death. The jury will look to the evidence to ascertain if this is true. As I recall the evidence, which you must remember, after nightfall Hopkins was sent to an industrial line over which the Southern Railway had control to bring therefrom the car of a private corporation. His primary duty was that of a conductor. If there were no inspectors at Augusta, it would be his duty under the rules of the company to inspect the cars which he moved. If, moreover, it appears that this car was moved here from the line of the Southern, was placed by the same company on the industrial line, was it negligence on the part of the conductor, who was sent for it in the night, to fail to discover the defects, if any, which existed, and did this failure directly or indirectly contribute in any manner to his death? In so far as the questions of fact are involved, these are matters for the determination of the jury. It appears from the evidence that the Southern has a large corps of inspectors at this place. The head inspector for the defendant company testified that he had 28 men under his orders, and that he could discharge any one of them if he failed to perform his duty.

"If, gentlemen, you find that the company was not negligent as charged in the declaration, you must find for the defendant. If you find that the deceased, the husband of the plaintiff, by negligence contributed in any manner, directly or indirectly to his own death, you must also find for the defendant. In either event your verdict will be, "We the jury, find for the defendant.'

"If, however, you find that the defendant was negligent as charged, and that such negligence caused the death of the plaintiff's husband, and that he did not by negligence in any manner contribute thereto, your verdict must be for the plaintiff, and in that event you will proceed to ascertain the amount you should find for damages.

"In volume 70, I believe, of the reports of the Supreme Court of Georgia, certain tables are to be found which are in evidence before you, and which that court has held to be admissible in evidence for the purposes for which they were designed. It is also admissible here for the same purpose. They are not, however, binding upon you, and you may use them or not as you see fit. They are admitted in evidence solely to aid you in reaching certain reasonable and proper conclusions, because they show the result of certain observations and calculations which may be of assistance to you in your consideration of this case.

"On page 845 appears what is called the Carlisle Mortality Table, and from it can be obtained the probable expectancy of life under ordinary conditions remaining to persons of various ages. If it is proven before you that the husband of the plaintiff in this case was 39 years of age at the time of his death, by consulting this table we may ascertain that the average person

of that age may reasonably expect to live about 28¼ years longer, barring any unusual contingencies. If, then, you discover from the evidence the average yearly earning capacity of the deceased, the use of this table by indicating the probable expectancy of life may assist you in reaching a conclusion as to the aggregate value of the earnings of the deceased during the remainder of his lifetime had he lived out his expectancy, of course, taking into consideration any probable increase or diminution in his earning capacity during the remainder of such expectancy. You will, however, conclude for yourselves from all the facts proven in the case, the condition of health, the nature of occupation, and the general surroundings of the deceased what his reasonable expectancy would have been. When you arrive in your own minds at the probable aggregate earnings of the deceased for the remainder of his life, had he lived out his expectancy, your next duty will be to reduce this amount to its present cash value, or such sum as paid at one time, would be equivalent, in your judgment, to such aggregate earnings spread over quite a long period of years. For this the court can, of course, give you no definite rule, and you will have to determine such sum for yourselves. I repeat that this table is not binding upon you. You may use it if you think proper. You may reach your conclusion as to damages, if you decide the defendant is liable, according to the method I have given you, or according to the method you may adopt.

"On page 947 of the volume referred to you will find another table, by which the value of annuities on the lives of persons may be calculated. This table of annuities is designed to show the actual present cash value of annuities, or aggregate yearly cash earnings, figured at $1 per year, for persons of various ages. If it has been proven before you that the deceased, was 39 years old at the time of his death, by referring to the table you might reasonably conclude that at $1 per year for each year during the reasonable expectancy of life of a person 39 years old that the present actual cash value of such an annuity or yearly income, figured at 7 per cent. the legal rate in this state, would be $10.939. You would then fix the probable reasonable yearly income of the deceased had he lived from all the facts and circumstances in the case, and, if you should determine that amount to be $900 a year, which is at the rate of $75 a month, you would then multiply such sum by 10.939, the value of the annuity at $1 per year, and thus obtain $9,845.10 as the actual present cash value of his life.

"This annuity table may assist you in reaching a conclusion as to amount in a somewhat more mathematical and shorter way, and you may prefer to use it rather than the table first explained, but the two tables are not to be confused, for they are not to be used together, as the methods of obtaining results by them are different. I again repeat that the method of ascertaining damages by the jury, after considering all the proof, is one that the jury may determine for itself, in case they find the defendant liable. In case you find for the plaintiff, your verdict should read, 'We, the jury find, for the plaintiff the sum of so much—stating it—with costs of suit,' and your foreman will sign it.

"If you find for the defendant, your verdict will be, 'We the jury find for the defendant, with costs of suit.'"